[No. C048410. Third Dist. Apr. 5, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
VICTOR LEE SEVERANCE, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part I of the Discussion.

308

**COUNSEL**

Mark Alan Hart, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Stephen G. Herndon and Maureen A. Daly, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ROBIE, J.**—In a prior appeal, this court remanded this case for trial on defendant Victor Lee Severance's plea of not guilty by reason of insanity. At the beginning of that trial, the court denied defendant's belated request to represent himself.[1] At the end of the trial, the court granted the prosecution's motion for a directed verdict of sanity.

In this appeal, defendant contends the trial court erred in denying his request to represent himself and in directing a verdict of sanity. We conclude the trial court did not abuse its discretion in denying defendant's belated request for self-representation because defendant's purpose was "to delay or disrupt the proceedings." We also conclude that a trial court has the power to direct a verdict of sanity when there is no substantial evidence that the defendant was insane at the time of his crimes. Since that was the case here, the trial court did not err in taking the issue of defendant's sanity from the jury. Accordingly, we will affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In January 2000 defendant robbed a coffee shop, and in May 2000 he robbed two stores. At his arraignment in September 2000, he entered dual pleas of not guilty and not guilty by reason of insanity. Defendant represented himself in a jury trial on four counts of second degree robbery with four related weapon enhancements, with Howard McEwan serving as standby counsel.

The jury found defendant guilty of all four charges and found the weapon enhancement allegations true. At the outset of a separate jury trial on allegations of three prior convictions, defendant requested an attorney. After initially denying that request, the trial court appointed McEwan to represent defendant. The trial on the prior conviction allegations then proceeded, and the jury found those allegations true. The trial court subsequently sentenced defendant to four consecutive indeterminate terms of 25 years to life and to consecutive determinate terms totaling 19 years. No sanity trial was ever held.

---

[1] Such requests are often referred to as *Faretta* motions. (See *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525].)

In October 2002, this court affirmed the jury's verdicts but reversed the judgment and remanded the case for trial on defendant's insanity plea. The remittitur issued in January 2003.

Following various delays, the sanity phase of defendant's trial was held in October 2004.[2] At the outset of the trial, the court denied defendant's request to represent himself based on the conclusion that defendant's purpose was "to delay or disrupt the proceedings." Defendant testified on his own behalf. The substance of his testimony was as follows:

In response to questions from his attorney, defendant testified he had not felt very well for the past four and one-half years, since the police bashed in his head. He remembered the year 2000 only "[a] little bit." He was not in control of himself then because whenever he gets hit in the head Satan takes control of his body and he goes crazy and does things he does not normally do. Satan invites defendant to come join him, but defendant refuses because defendant is the Savior, who is here to rescue mankind. Defendant has Satan trapped inside his body, and when he dies he will take Satan with him to a faraway planet, where Satan will leave his body and they will begin a new planet like earth.

Defendant did not remember taking a gun and trying to get money from somebody because when Satan takes control of his body, he goes into a state of fugue amnesia, which is caused from blows to the head and which he read about in a book.

That concluded the testimony defendant gave in response to questions from his attorney. Defendant, however, was allowed to give additional testimony on his own, which was as follows:

Defendant is 50 years old and suffered severe head trauma about six times in his life. The first time was when he was four years old and was run over by a hit-and-run driver. In 1980, he was knocked out by a blow to the head with a baseball bat; in 1983, he suffered a similar fate from a bumper jack. In 1986, he was hit on the head six times with the butt of a handgun; in 2000, the police bashed in his head, and he went crazy again. All of the incidents, except the one in his childhood, caused him to become paranoid and schizophrenic. Satan would take control of his mind, he would use heroin to kill the pain and speed to stay awake, and he would go in and out of consciousness, lose his memory, and wind up in jail.

---

[2] The details of those delays, which are relevant to defendant's claim that the trial court erred in denying his request to represent himself, are set forth more fully in the Discussion part of this opinion.

Defendant believes he suffered some sort of brain damage from the accident when he was four because he is unable to think like a normal person. He is 60 percent deaf and a real slow thinker. He received no medical treatment for his childhood injury because his mother thought he was lying.

Defendant's father died when he was eight and his mother remarried when he was 10. His stepfather used to get drunk and beat him with a board. When he turned 18, he was kicked out of the house, and he lived in a field. There, he was abducted by aliens one night and they operated on his brain. Now, he receives Morse code signals from outer space through his right ear. His life of crime began when he burglarized a home for food and was put in the Department of Youth Authority for two years. Since, his life has been pure hell. He works, then gets depressed, loses his job, starts drinking, and winds up getting his head bashed in, which is when Satan takes control of his mind and body. Eventually he ends up in jail for committing crimes without any memory of what he did because of the head trauma and amnesia.

Defendant never received treatment for mental illness while incarcerated. He has been taking Paxil and Risperdal for three years and is now feeling really good. He believes he has mad cow disease and believes he is dying. Also, his little brother and his uncle were diagnosed with paranoid schizophrenia. He hopes to be declared insane so he can go to a prison that has a mental facility.

Referring to a tape recording of a jailhouse conversation with his brother, defendant testified that his statement that he is "just playing the nut routine" was just "a jailhouse slang comment."[3] He thinks it is funny and he uses it quite often, but he is not faking it. The psychologists think he is faking it because he has an above-average IQ of about 140, and he majored in psychology. They only interview him when he is on medication, living in a stable environment, and Satan is not in control of his body.

Defendant concluded his statement by saying he felt great for the first time in his life, and if you asked him, he would say he is not crazy right now, but he does know he is the Savior, here to rescue mankind.

On cross-examination, defendant admitted he pled no contest to a charge of robbery in 1984, but he claimed that was when he was hit on the head with a bumper jack and a baseball bat. Defendant would not know if he was

---

[3] In that conversation, when defendant's brother asked about his hair (which was apparently unkempt), defendant told his brother, among other things, "I'm doing the homeless nut routine."

convicted of robbery in 1986 because that was after he got hit on the head with the butt of a gun.

At that point, the court told the jury it was taking judicial notice that the prior jury in the case had found defendant had three prior convictions for robbery.

On further cross-examination, defendant claimed he was unconscious during the two robberies in May 2000, but he did not commit any robbery in January 2000. It was after January 15 when the police bashed in his head. He also admitted he wrote a letter to a victim of one of the May robberies in which he said he was sorry for doing what he did, that you cannot do much with an unloaded BB gun, and asked her not to give the letter to the district attorney.

The tape of defendant's jailhouse conversation with his brother was then played for the jury.

On further cross-examination, defendant claimed he had been unable to answer questions the week prior during a competency hearing because he was in shock and on medications, not because he was trying to show he was unable to aid in his defense.

The prosecution then presented its case. Daren Allbee, a deputy with the Sacramento County Sheriff's Department, who was familiar with defendant from the jail, testified defendant had never told him about the Devil talking to him or anything of an unusual nature. Deputy Allbee also testified that he taped the conversation between defendant and his brother.

Deputy Sheriff Michael Daniels testified about defendant's behavior the previous week, before and during the competency hearing.

Dr. Shawn Johnston, a psychologist, testified that he interviewed and tested defendant in March 2003. Dr. Johnston expressed his opinion that defendant has an antisocial personality disorder, but he knew exactly what he was doing when he committed the robberies. Dr. Johnston further testified that defendant is not exaggerating; he is "just plain making it up" and "outright malingering." On cross-examination, however, Dr. Johnston admitted that a person's mental state could change dramatically in three years (which was the time between defendant's crimes and the time of Dr. Johnston's interview with defendant).

Dr. Bruce Ebert, a psychologist and attorney, testified that he interviewed and tested defendant in April 2003. In Dr. Ebert's opinion, defendant does not have any kind of mental disorder or defect that would cause him to commit crimes, but he has various significant problems with antisocial behavior. Defendant knew what he was doing and was capable of distinguishing right and wrong when he committed the robberies. Like Dr. Johnston, Dr. Ebert admitted on cross-examination that it is possible for a person's mental condition to change drastically in three years. Dr. Ebert also testified that Risperdal is a very strong psychotropic medication that is prescribed for people who hear voices.

Following Dr. Ebert's testimony and defense counsel's acknowledgment that he had no further evidence, the prosecution orally moved for a directed verdict of sanity, contending there was no evidence "of sufficient substantiality to support any verdict, whatsoever." In its motion, the prosecution cited *People v. Ceja* (2003) 106 Cal.App.4th 1071 [131 Cal.Rptr.2d 601], as authority for removing the issue of sanity from the jury.

Defense counsel objected to the motion, asserting that "[b]oth doctors . . . acknowledged that somebody's mental state can change drastically in a matter of a few years" and defendant's "testimony speaks for itself."

The trial court relied on *Ceja* as authority for granting the prosecution's motion, and after a lengthy series of comments on the evidence presented by the defendant and the prosecution, the court granted the motion on the ground that "defendant has failed to meet the burden of proving by a preponderance of the evidence that he suffered from a mental condition that rendered him incapable of knowing or understanding the nature and quality of his act, or incapable of distinguishing right from wrong in relation to that act."

The court subsequently sentenced defendant to the same sentence as before—four consecutive terms of 25 years to life and an aggregate consecutive determinate term of 19 years.

## DISCUSSION

### I

### *Denial of Self-representation**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 305.

## II

### *Directed Verdict*

Defendant contends the trial court has no power to take the issue of sanity from the jury under any circumstances and therefore the trial court denied him his constitutional right to due process and his constitutional and statutory right to a jury trial by directing a verdict of sanity. He further contends that even if the trial court has the power to direct a verdict of sanity, the court erred in doing so here because there was sufficient evidence for the jury to find he was insane at the time of his crimes. We disagree on both points.

### A

### *The Trial Court's Power to Direct a Verdict of Sanity*

#### 1. *Forfeiture*

As an initial matter, the People contend defendant forfeited his claims that the trial court denied him his constitutional and statutory rights by directing a verdict of sanity because defendant did not raise these claims in the trial court. According to the People, if defendant had "presented his constitutional and statutory arguments to the trial court, that court . . . could have corrected any error at that time."

■ This argument need not detain us long. In directing a verdict in favor of the prosecution, the trial court relied on *People v. Ceja*, in which Division Four of the Second District Court of Appeal held that trial courts have the inherent power to remove an insanity defense from the jury when there is no evidence to support it and in such a circumstance "there is no constitutional infirmity, either under the California Constitution or the United States Constitution, for a judge to remove the issue of sanity from the jury . . . ." (*People v. Ceja, supra*, 106 Cal.App.4th at p. 1089.) No other California appellate court has expressly addressed this issue in a published opinion.[6]

"Decisions of every division of the District Courts of Appeal are binding . . . upon all the superior courts of this state . . . . Courts exercising inferior jurisdiction must accept the law declared by courts of superior

---

[6] The Supreme Court avoided deciding this issue in *People v. Hernandez* (2000) 22 Cal.4th 512 [93 Cal.Rptr.2d 509, 994 P.2d 354], although Justice Brown did express her opinion on the subject in a concurring opinion. (*Id.* at pp. 528–530 (conc. opn. of Brown, J.).)

jurisdiction. It is not their function to attempt to overrule decisions of a higher court." (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) Thus, it would have been futile for defendant to have argued to the trial court that it had no power to direct a verdict of sanity, because the trial court was bound by *Ceja*'s decision otherwise. Accordingly, defendant did not forfeit these arguments. (See *Wilson v. John Crane, Inc.* (2000) 81 Cal.App.4th 847, 851, fn. 9 [97 Cal.Rptr.2d 240].)

### 2. *Power to Direct a Verdict of Sanity*

As we have noted, in *People v. Ceja, supra,* 106 Cal.App.4th at page 1071, Division Four of the Second District Court of Appeal held that trial courts have the inherent power to remove an insanity defense from the jury when there is no evidence to support it and there is no constitutional infirmity in the court doing so. In reaching this conclusion, the *Ceja* court (drawing in part on Justice Brown's concurring opinion in *Hernandez*) analogized a plea of not guilty by reason of insanity to a plea of once in jeopardy. (*Ceja,* at p. 1085.) Both are " 'special plea[s]' with the burden of proof resting on the defendant." (*Ibid.*) Because neither plea involves the defendant's guilt of the underlying crimes,[7] the defendant has no presumption of innocence to aid him and therefore must prove the defense. (*Ceja,* at p. 1085.) If he fails to offer sufficient evidence to do so, then the court may remove the issue of sanity from the jury. (*Id.* at p. 1089.)

Defendant asserts that "*Ceja* is wrong because dismissal of a plea of not guilty by reason of insanity offends constitutional principles of due process and the right to present [an] affirmative defense to a jury, and also because the Legislature has, by statute, created the right to a jury trial on a plea of not guilty b[y] reason of insanity without giving the trial court any statutory authority to take the issue from the jury."

We begin with defendant's statutory argument. It is true, as defendant notes, that "[n]o statute explicitly gives a trial court authority to direct a verdict against a defendant on the issue of an affirmative defense." It is equally true, however, that the California Supreme Court long ago recognized the courts have that power inherently where the affirmative defense is in the

---

[7] "[G]uilt and sanity are separate issues . . . . Insanity, under California law, means that at the time the offense was committed, the defendant was incapable of knowing or understanding the nature of his act or of distinguishing right from wrong." (*People v. Hernandez, supra,* 22 Cal.4th at p. 520.)

nature of a special plea. (See *People v. Newell* (1923) 192 Cal. 659, 667–668 [221 P. 622] [special plea of once in jeopardy].) This is so because "[i]t is just as necessary to support special pleas by proof [citation] as it is to interpose the pleas, and the failure to do either is to be deemed a waiver of the defense." (*Id.* at p. 667.)

Defendant contends a special plea of not guilty by reason of insanity must be treated differently than a special plea of once in jeopardy because "[a] plea of once in jeopardy may raise a mixed question of law and fact," whereas "Penal Code section 25, subdivision (b), and section 1026, subdivision (a), specifically assigns to the jury, the factual question raised by a plea of not guilty by reason of insanity."

We are not persuaded. Like a plea of not guilty by reason of insanity, a plea of once in jeopardy *usually* presents "an issue of fact . . . which the jury alone possesse[s] the power to pass upon." (*People v. Bennett* (1896) 114 Cal. 56, 59 [45 P. 1013].) If, however, "the defendant fails to support [the plea of once in jeopardy] with proof, . . . it becomes a question of law upon which the court must pass." (*People v. Newell, supra,* 192 Cal. at p. 667.)

■ Defendant offers no logical reason why a plea of not guilty by reason of insanity should be treated any differently. Like any issue that is usually treated as one of fact, the issue of a defendant's sanity can become one of law in the proper circumstances. "An issue of fact is one where the evidence introduced will support a decision on either side, that is to say, reasonable minds could fairly differ as to the answer to the question posed. [Citations.] An issue of fact can become an issue of law when reasonable minds can draw only one conclusion from the evidence. [Citations.] An issue of fact cannot be taken from a jury by the trial court and treated as an issue of law unless only one conclusion is legally deducible and any other conclusion cannot command the support of substantial evidence that will survive appellate review." (*Pan Asia Venture Capital Corp. v. Hearst Corp.* (1999) 74 Cal.App.4th 424, 433 [88 Cal.Rptr.2d 118].)

■ As Justice Brown explained in her concurring opinion in *People v. Hernandez, supra,* 22 Cal.4th at page 528, the California Supreme Court has long held that in cases involving the special pleas of once in jeopardy and former judgment of conviction or acquittal, "Where 'the evidence is uncontradicted or leads to a single conclusion a question of law is presented' [citation], and 'the trial court is not required to submit the question to the jury for a finding upon that plea' [citation]. Instead, the court may strike the plea [citation], or direct a verdict in favor of the prosecution or the defendant." (See, e.g., *People v. Bechtel* (1953) 41 Cal.2d 441, 445 [260 P.2d 31]; *People v. Wilson* (1924) 193 Cal. 512, 514–515 [226 P. 5]; *People v. Newell, supra,*

192 Cal. at p. 668.) There is no logical reason these same principles should not apply to a plea of insanity. Just as a criminal defendant may be "precluded from presenting to a jury defense such as unconsciousness [citation], diminished capacity [citation], [or] entrapment [citation], where there is insufficient evidence from which a reasonable jury could conclude that the particular facts underlying the instruction requested exist" (*People v. Mapp* (1983) 150 Cal.App.3d 346, 350 [198 Cal.Rptr. 177]), so a criminal defendant may be precluded, through the grant of a directed verdict, from presenting an insanity defense where the evidence is insufficient for a reasonable jury to find the defendant was insane at the time of his crimes.

There is nothing in the statutes upon which defendant relies to suggest the Legislature intended the trial court to have to submit a plea of not guilty by reason of insanity to the jury in every case, even when the defendant has failed to support that plea with substantial evidence.

■ Subdivision (b) of Penal Code section 25—the first statute on which defendant relies—provides that "[i]n any criminal proceeding . . . in which a plea of not guilty by reason of insanity is entered, this defense shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense." This statute limits when a trier of fact can find the defendant not guilty by reason of insanity; it does not purport to require the issue of sanity to be submitted to a jury under all circumstances, even when the defendant has not offered substantial evidence of insanity.

Subdivision (a) of Penal Code section 1026—the other statute on which defendant relies—details how a case is to be handled when a defendant pleads not guilty by reason of insanity, generally providing that the issue of sanity shall be tried before a jury.[8] Again, however, the statute does not purport to

---

[8] "When a defendant pleads not guilty by reason of insanity, and also joins with it another plea or pleas, the defendant shall first be tried as if only such other plea or pleas had been entered, and in that trial the defendant shall be conclusively presumed to have been sane at the time the offense is alleged to have been committed. If the jury shall find the defendant guilty, or if the defendant pleads only not guilty by reason of insanity, then the question whether the defendant was sane or insane at the time the offense was committed shall be promptly tried, either before the same jury or before a new jury in the discretion of the court. In that trial, the jury shall return a verdict either that the defendant was sane at the time the offense was committed or was insane at the time the offense was committed. If the verdict or finding is that the defendant was sane at the time the offense was committed, the court shall sentence the defendant as provided by law. If the verdict or finding be that the defendant was insane at the time the offense was committed, the court, unless it shall appear to the court that the sanity of the defendant has been recovered fully, shall direct that the defendant be confined in a state hospital for the care and treatment of the mentally disordered or any other appropriate public or private treatment facility approved by the community program director, or the court may

require the issue of sanity to be submitted to a jury even when the defendant has not offered substantial evidence of insanity.

We conclude there is no statutory bar to a trial court's directing a verdict of sanity. Accordingly, we turn to defendant's constitutional arguments.

Defendant contends the constitutional right to trial by jury in a criminal case encompasses the sanity phase of the trial, and because "[a] court may not direct a verdict for the prosecution no matter how overwhelming the evidence may be," it follows that a court may not direct a verdict of sanity. We disagree.

█ "The rule prohibiting verdicts directed against an accused emanates from the guarantee of due process and the right to a jury trial. Due process 'protects the accused against conviction except upon proof beyond a reasonable doubt of *every fact* necessary to constitute the crime with which he is charged' [Citation.] It requires the state to prove ' "every ingredient of an offense beyond a reasonable doubt . . . ." ' " (*People v. Figueroa* (1986) 41 Cal.3d 714, 725 [224 Cal.Rptr. 719, 715 P.2d 680].) Thus, the defendant has a constitutional right to have a jury determine whether he committed the charged offense. As Justice Brown explained in her concurring opinion in *Hernandez,* however, "Because a finding of insanity under California law 'is dispositive only on the question of whether the accused is to be held criminally responsible for committing the charged offense[,] it is not determinative of whether the elements of the offense, and thus the criminal conduct itself, have been established.' [Citations.] Thus, taking the issue of insanity away from the jury does not violate the United States or California Constitution." (*People v. Hernandez, supra,* 22 Cal.4th at p. 529 (conc. opn. of Brown, J.).)

The mere fact that "[t]he 'sanity trial is . . . a part of the same criminal proceeding as the guilt phase' " (*People v. Hernandez, supra,* 22 Cal.4th at p. 521) makes no difference. In the guilt phase, the defendant is constitutionally entitled to a presumption of innocence which is infringed if the court directs a verdict of guilt. In the sanity phase, there is no constitutional entitlement to a presumption of insanity, and the state can require the defendant to prove insanity by a preponderance of the evidence. If he offers no substantial evidence to meet that burden of proof, then there is no constitutional bar to the trial court's directing a verdict of sanity. Accordingly, we turn to the issue of whether defendant offered sufficient evidence in this case to meet his burden of proof.

order the defendant placed on outpatient status pursuant to Title 15 (commencing with Section 1600) of Part 2." (Pen. Code, § 1026, subd. (a).)

B

*The Directed Verdict of Sanity in This Case*

1. *Standard of Review*

The People contend the sufficiency of the evidence standard of review applies to appellate review of a sanity determination, and the question for us to decide is "whether there is any reasonable hypothesis upon which the trial judge could have found the defendant legally sane during the commission of the crime." That would be true if we were reviewing a sanity determination by the court sitting *as the trier of fact*. (See, e.g., *People v. Belcher* (1969) 269 Cal.App.2d 215, 220 [74 Cal.Rptr. 602].) Here, however, the *jury* was the trier of fact, and the trial court *took* the issue of sanity from the jury when it directed a verdict of sanity. Thus, the appropriate standard of review is the one for a directed verdict.

On appeal, we review a directed verdict de novo. (*Brassinga v. City of Mountain View* (1998) 66 Cal.App.4th 195, 210 [77 Cal.Rptr.2d 660].) Thus, we apply the same rules the trial court was supposed to apply in determining whether a directed verdict was proper. For these rules, we turn to our Supreme Court's decision in *Estate of Lances* (1932) 216 Cal. 397 [14 P.2d 768], where the court explained as follows: "It has become the established law of this state that the power of the court to direct a verdict is absolutely the same as the power of the court to grant a nonsuit. A nonsuit or a directed verdict may be granted 'only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given.' [Citations.] Unless it can be said as a matter of law, that, when so considered, no other reasonable conclusion is legally deducible from the evidence, and that any other holding would be so lacking in evidentiary support that a reviewing court would be impelled to reverse it upon appeal, or the trial court to set it aside as a matter of law, the trial court is not justified in taking the case from the jury. [Citation.] A motion for a directed verdict 'is in the nature of a demurrer to the evidence, and is governed by practically the same rules, and concedes as true the evidence on behalf of the adverse party, with all fair and reasonable inferences to be deduced therefrom. . . . The power of a court in passing upon such motions is strictly limited. It has no power to weigh the evidence, but is bound to view it in the most favorable light in support of the verdict. . . .' [Citation.] In other words, the function of the trial court on a motion for a directed verdict is analogous to and practically the same as that of a reviewing court in determining, on appeal, whether there is evidence in the

record of sufficient substance to support a verdict. Although the trial court may weigh the evidence and judge of the credibility of the witnesses on a motion for a new trial, it may not do so on a motion for a directed verdict." (*Id.* at pp. 400–401.)

■ Thus, we do apply the substantial evidence standard of review, but in doing so we do not look for substantial evidence in support of the trial court's ruling that defendant was sane; rather, we look for substantial evidence from which the jury reasonably could have found defendant was *not* sane. If we find such evidence, then a directed verdict of sanity was improper.

Here, it is clear the trial court did not assiduously apply the rules set forth above in directing a verdict of sanity. In explaining its ruling, the court referred to "the experts in this case [who concluded] that the defendant was sane" and to their "scientific testing" which "refuted" defendant's assertion that he suffered brain damage from repeated blows to the head. These experts were *prosecution* witnesses. Thus, the court failed to disregard conflicting evidence and instead relied on that evidence to justify its decision.

After that, the court quoted at length from the tape recording of the jailhouse conversation between defendant and his brother, which the prosecution offered into evidence to impeach defendant. As it did so, the court inserted its own editorial comments about defendant's laughter,[9] defendant's presumed behavior during the conversation,[10] and the tone of defendant's voice.[11] Indeed, the trial court even went so far as to "urge any reviewing Court to listen to the actual audiotape to capture the tone and inflection of this defendant." The court also commented on defendant's laughter during the trial—something that does not appear as a matter of record—asserting that defendant laughed "because he thinks it's a great game, or it appeared to me, based on his conduct and my experience with other people laughing throughout my life. [¶] He laughed numerous times when the doctors called him more than a malingerer, an outright faker. He thought that was great fun."

It was not for the trial court, however, on a motion for a directed verdict—any more than it is for us on appellate review of a directed

---

[9] "This is laughter not of an insane individual or a person [who] is suffering from mental disease or defect, this is the mocking tone of arrogance. It is the tone of laughter one would expect, for example, amongst good friends or in a fraternity house."

[10] For example, when defendant said, "It's like this when I go to court, I'm like this," the court commented, "Presumably he's making a face."

[11] For example, at one point the court observed, "clearly the defendant, as confirmed by his tone, inflection and conduct that this is all a great fraud that he's bringing before the—." The court's editorial comment was cut off only by defendant's assertion, "You're being biased, Your Honor. That's being biased. You can't do that."

verdict—to evaluate the tone of defendant's voice or his laughter to deter-mine whether that tone appears to be "the mocking tone of arrogance." *That* determination was for the trier of fact.

Although qualifying his comments as "not in support of my ruling," the trial court also went on to assert that, based on his experience as a mental health judge, "this defendant does not in my personal experience display anything close to a mental disease or defect, and I have seen hundreds, if not thousands, of people that have suffered from those." Finally, in responding to defendant's claim that the court was being biased, the court stated, "Justice is blind, sir. You have the right to have fair treatment before these courts, but justice will not turn a blind eye to malingering, fraud or deceit. And that is what has occurred here. And that is what has been testified to by the doctors, that is what has been presented even through your own mouth . . . ."

The foregoing comments support the conclusion that the trial court essen-tially appointed itself the trier of fact, rather than adhering to its proper role, which was to determine whether the evidence, viewed in the light most favorable to defendant, was sufficient to send the case *to* the trier of fact. Because we review the trial court's ruling de novo, however, the court's mistake in this regard does not compel reversal. If we were to conclude the evidence, viewed in the proper light, was sufficient for a jury to reasonably find defendant was insane, then we would reverse the directed verdict. Because we conclude there was no such substantial evidence, however, we will affirm the verdict, having properly performed the task the trial court should have performed in the first place.

### 2. *The Test for Insanity*

"The test of legal insanity in California is the rule in *M'Naghten's Case* (1843) 10 Clark & Fin. 200, 210 [8 Eng.Rep. 718, 722], as adopted by the electorate in June 1982 with the passage of Proposition 8. That measure added section 25, subdivision (b) [to the Penal Code], which provides: 'In any criminal proceeding . . . in which a plea of not guilty by reason of insanity is entered, this defense shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense.' Despite the use of the conjunctive 'and' instead of *M'Naghten's* disjunctive 'or,' this court has interpreted the statute as recognizing two distinct and independent bases on which a verdict of not guilty by reason of insanity might be returned." (*People v. Lawley* (2002) 27 Cal.4th 102, 169–170 [115 Cal.Rptr.2d 614, 38 P.3d 461], fn. omitted.) "The incapacity must be based on a mental disease or defect even though that requirement is not specifically

mentioned in [Penal Code section] 25, subd[ivision] (b)." (*People v. Stress* (1988) 205 Cal.App.3d 1259, 1271 [252 Cal.Rptr. 913].)

The question here, then, is whether defendant offered sufficient evidence for a jury to reasonably conclude that, based on a mental disease or defect, he was incapable of: (1) knowing or understanding the nature and quality of his acts; or (2) distinguishing right from wrong when he robbed the coffee shop in January 2000 and the two stores in May 2000.

### 3. *The January 2000 Robbery*

We can easily resolve that question regarding the robbery in January 2000. Defendant's evidence was to the effect that after he gets hit on the head, he does things he would not usually do (which he cannot remember). On cross-examination, however, he said he did not commit the robbery in January 2000 because he "was doing good" and "there's no reason for me to go out and commit crimes in January of 2000." He further claimed it was "after January 15th when the cops mistook me for some—for someone [who] had run away from them and they bashed my head in." The evidence in the guilt phase trial revealed the robbery of the coffee shop occurred on January 3, 2000. Thus, even viewing the evidence in the light most favorable to defendant, there is no substantial evidence on which a reasonable jury could have concluded he was insane when he robbed the coffee shop in January 2000.

### 4. *The May 2000 Robberies*

That leaves us with the robberies in May 2000. Acknowledging that an insanity defense cannot be solely based on an addiction to, or abuse of, intoxicating substances (Pen. Code, § 25.5), defendant contends his testimony "provided sufficient evidence to submit his plea of not guilty by reason of insanity to the jury, even if those portions of his testimony relating to his substance abuse are disregarded." That testimony was essentially that he was hit on the head in January 2000, and when he is hit on the head he becomes paranoid and schizophrenic, Satan takes control of his mind and body, and he does things he does not normally do. In addition, defendant testified he was abducted by aliens who are sending signals to his brain, that he is the Savior, and that he has been taking Paxil and Risperdal for three years. Risperdal is a very strong psychotropic medication that is given to people who hear voices. Also, defendant's brother and uncle both suffer from paranoid schizophrenia.

Based on this evidence, defendant contends "a rational jury could conclude that [he] is incapable of distinguishing right from wrong and . . . that [his] amorality is the product of a mental disease or defect." We disagree.

We note that even defendant does not contend the evidence was sufficient for the jury to find he was incapable of knowing or understanding the nature and quality of his acts when he committed the May 2000 robberies. Instead, defendant relies entirely on the second part of the *M'Naghten* test—whether he was capable of distinguishing right from wrong when he committed the robberies. Defendant emphasizes that the issue under the second part of the *M'Naghten* test is "whether a defendant can distinguish, not the legal rightness or wrongness of his act, but its moral rightness or wrongness." (*People v. Stress, supra,* 205 Cal.App.3d at p. 1272.) Thus, if a person is incapable, because of a mental disease or defect, of understanding that his actions are morally wrong—that is, in violation of generally accepted standards of moral obligation—then that person is legally insane, regardless of whether he knows his actions are illegal. (See *id.* at p. 1275.)

Defendant suggests the jurors could have found he was insane because they could have concluded he was suffering from a delusion that his conduct was morally correct. We disagree because the evidence simply did not speak to that point. No evidence was presented from which the jury reasonably could have found defendant was acting under an insane delusion that robbing the two stores was somehow morally correct. And in the absence of such evidence, defendant cannot prevail.

The hole in the evidence here is made clear by a comparison of this case to two other cases—*People v. Skinner* (1985) 39 Cal.3d 765 [217 Cal.Rptr. 685, 704 P.2d 752] and *People v. Stress, supra,* 205 Cal.App.3d at page 1259. In *Skinner,* the defendant, who suffered from paranoid schizophrenia, killed his wife while he was on a day pass from a mental hospital. (*Skinner,* at p. 770.) "A delusional product of this illness was a belief held by [the] defendant that the marriage vow 'till death do us part' bestows on a marital partner a God-given right to kill the other partner who has violated or was inclined to violate the marital vows, and that because the vows reflect the direct wishes of God, the killing is with complete moral and criminal impunity. The act is not wrongful because it is sanctified by the will and desire of God." (*Ibid.*) The Supreme Court characterized this as "clearly sufficient evidence, that [the] defendant could not distinguish right and wrong with regard to his act." (*Id.* at p. 784.)

In *Stress,* the defendant, who suffered from paranoid delusions, killed his wife as an attempt " 'to have a day in court.' " (*People v. Stress, supra,* 205 Cal.App.3d at pp. 1263, 1264.) The defendant "had been under a federal indictment for two years, charged with writing threatening letters to the President of the United States." (*Id.* at p. 1263.) He believed a conspiracy existed between various agencies "to insure that professional athletes were not drafted for service in the war. . . . Making the public aware of this conspiracy

became a crusade." (*Id.* at pp. 1262–1263.) He "was concerned his case would not come to trial since it appeared the judge wanted him to receive psychiatric treatment." (*Id.* at p. 1263.) The defendant had considered killing himself, but then no one could tell his story, so he killed his wife as " 'the lesser of two evils.' " (*Ibid.*)

The Court of Appeal concluded the evidence was sufficient to support a finding that the defendant could not distinguish between right and wrong because his "explanation for killing his wife was liberally sprinkled with comments indicating her death would contribute to some higher good. He described his dealings with the government as a war and his wife as a soldier in that war. While the center of [his] motivation was to be charged with a serious crime and thus be provided a forum to espouse his ideas, he at one time stated that if aware of the facts of his crusade, no jury would convict him. We believe these facts can be interpreted as a belief by [the defendant] that while his act was illegal, it did not violate generally accepted moral standards." (*People v. Stress, supra,* 205 Cal.App.3d at p. 1275.)

Unlike in *Skinner* and *Stress,* here there was no evidence from which a jury reasonably could have found that defendant was suffering from a paranoid delusion that led him to believe his crimes were morally acceptable. Indeed, there was no evidence about what defendant believed or did not believe in May 2000. The gist of defendant's claim of insanity was that after he was hit on the head in January 2000, Satan took control of his mind and body and he did things he does not normally do—namely, rob two stores. In the words of Flip Wilson playing Geraldine, "the Devil made him do it." In essence, defendant's claim of insanity was a claim he acted under an "irresistible impulse." The irresistible impulse test, however, has long been discredited in California as a test for legal insanity.[12] (See, e.g., *People v. Nash* (1959) 52 Cal.2d 36, 45–46 [338 P.2d 416].)

In summary, even if credited and viewed in the light most favorable to defendant, defendant's evidence did not provide a substantial basis for the jury to find that at the time he committed the robberies in May 2000, defendant believed his actions were morally acceptable. Because there was no substantial evidence of legal insanity, the trial court did not err in directing a verdict in favor of the prosecution on that issue.

---

[12] As our Supreme Court explained more than a century ago, "It must be held that, conceding that the act was the offspring of an irresistible impulse, and the impulse was irresistible because of mental disease, still the defendant must be held responsible if he at the time had the requisite knowledge as to the nature and quality of the act, and of its wrongfulness." (*People v. Hubert* (1897) 119 Cal. 216, 223 [51 P. 329].)

## DISPOSITION

The judgment is affirmed.

Blease, Acting P. J., and Nicholson, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 28, 2006, S143298. Kennard, J., was of the opinion that the petition should be granted.