Filed 3/24/16  P. v. Cook CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>NATHANAEL JOSEPH COOK,<br><br>          Defendant and Appellant. | A144404<br><br>(Alameda County<br>Super. Ct. No. 172254) |

Appellant Nathanael Joseph Cook[1] stole a bicycle, fired several shots at a man who tried to take the bicycle back, fled from police, pointed his gun at a passing motorist, and hid between parked cars before firing several shots at a pursuing officer, hitting him once in the leg.  He was charged with numerous counts with special allegations, including two counts of attempted murder with firearm use, and entered pleas of not guilty and not guilty by reason of insanity.  During the guilt phase of the proceedings, a jury convicted appellant as charged and found all special allegations to be true.  During the sanity phase, the court directed a verdict in favor of the prosecution and found appellant to be sane.

Appellant contends the trial court committed prejudicial error by (1) rejecting instructions on attempted voluntary manslaughter based on imperfect self-defense as a lesser included offense of the attempted murder counts; (2) denying his motion for an in

---

[1] We note that appellant's first name is spelled "Nathaniel" and "Nathanael" throughout the record.  It appears from pleadings and other reliable documentation that the correct spelling is "Nathanael," and we therefore adopt that spelling throughout this opinion.

1

camera review of police personnel records under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*); and (3) directing a verdict in favor of the prosecution on the issue of insanity.[2]  We affirm.

## I.  BACKGROUND

### A.  *Trial Evidence—Guilt Phase*

On the afternoon of January 25, 2013, Hector Arriola was walking his bicycle along 48th Avenue in Oakland.  Appellant forcibly took the bicycle and rode away. Arriola's friend, Jose Atunez, yelled at appellant, "Hey, what you doing" and said, "Hey, the bike.  The bike."  Appellant stopped, dismounted, pulled a black semiautomatic handgun from his waistband, and fired several shots at Atunez from a distance of about 15 feet.  None of the shots hit Atunez.  Appellant abandoned the bicycle and ran toward 12th Street.

Oakland Police Department officers were investigating a hit-and-run accident nearby when they heard the gunshots.  Officer D'Vour Thurston got into his patrol car and followed appellant, who was running very quickly down 48th Avenue.  Officer Richard Holton followed in a separate patrol car.  Appellant turned on East 12th Street and ran north on 49th Avenue.

Officer Thurston lost sight of appellant after he turned onto 49th Avenue.  He stopped his patrol car and started to get out to look for appellant, meanwhile updating police dispatch on the developing situation.  As soon as Thurston opened the driver's side door and placed his foot down on the street surface, appellant rose up from behind a parked car and began shooting at him.  Appellant fired five to eight shots, then tried to fire more, but the gun appeared to be empty.  One of the shots hit Thurston in the leg. Though in great pain, Thurston chased appellant toward 50th Avenue.  Thurston never drew his service weapon or fired it during the pursuit.

---

[2] In his reply brief, appellant has withdrawn a claim that the evidence was insufficient to support one of the attempted murder convictions.

Officer Holton stopped his patrol car at the intersection of 49th Avenue and East 12th Street and saw appellant running away from Officer Thurston. He did not see appellant fire his gun at Thurston. Thurston yelled at Holton to "get" appellant, and as Holton gave chase, Thurston yelled at him to "shoot" appellant. As Holton began to unholster his gun, he saw appellant draw a gun from his right waistband. Fearing that appellant would shoot him or Thurston, Holton fired three shots at appellant but did not hit him. Appellant tossed his gun to the ground and ran around to the back of a parked car, lying on his back and placing his arms straight into the air. Backup officers soon arrived, and appellant continued to lie on the ground and comply with the officers' commands. Appellant understood the commands and offered no resistance. He said, "It wasn't me" and "It was a setup."

At some point during the chase appellant had passed a car driven by Robert Jordan and pointed his gun at Jordan for five to ten seconds.

A video surveillance camera captured part of the incident, including the shots fired at Atunez. The tape was played for the jury.

Appellant testified that he had been using drugs and alcohol since his early teens and, after a period of sobriety, he was essentially homeless and using drugs again. Sometimes he had panic attacks or became paranoid after using drugs. Since being incarcerated for the charged offenses, appellant had taken psychotropic drugs including lithium, Lexapro, Risperdal and Zoloft, which helped him think more clearly.

On the day of the shooting, appellant smoked some marijuana and left the home of his girlfriend to look for a place to stay. He was carrying a gun he had stolen for protection because living on the streets was dangerous and he had been assaulted. Appellant felt an intense paranoia, like someone was going to kill him, and he was desperate to leave Oakland. When it started getting dark he panicked and took a bicycle to get to the BART station. A man (Atunez) yelled at him, and appellant thought the man had a weapon, so he dropped the bicycle and started to run. He was "panicked" and only remembered about 10 percent of the incident. Appellant did not remember shooting at Atunez. He did not remember seeing Atunez with a weapon. He did not remember

3

running from the scene, hiding behind a car, or shooting a gun at a police officer. He "vaguely remember[ed] being shot at," but was only concerned for his safety and did not mean to shoot or kill anyone.

David Berke, Ph.D., a psychologist who interviewed appellant at the jail after he was arrested for the offenses, testified on rebuttal that appellant admitted stealing a bicycle, firing a gun at Atunez, and shooting at the police.

B. *Verdict*

The jury convicted appellant of the following offenses and special allegations: attempted murder of D'Vour Thurston, a peace officer, with firearm and great bodily injury allegations (Pen. Code, §§ 187, subd. (a), 664, subd. (e), 12022.5, subd. (a), 12022.53, subds. (b)–(d), (g), 12022.7; count one);[3] assault with a semiautomatic firearm upon D'Vour Thurston, a peace officer, with firearm and great bodily injury allegations (§§ 245, subd. (d)(2), 12022.5, subd. (a), 12022.53, subds. (b)–(d), (g), 12022.7; count two); shooting at a motor vehicle (Thurston's patrol car) with firearm and great bodily injury allegations (§§ 246, 12022.5, subd. (a), 12022.53, subds. (b)–(d), (g), 12022.7; count three); attempted murder of Jose Atunez with firearm allegations (§§ 187, subd. (a), 664, subd. (a), 12022.5, subd. (a), 12022.53, subds. (b),(c) & (g); count four); assault with a semiautomatic firearm on Jose Atunez with a firearm allegation (§§ 245, subd. (b), 12022.5, subd. (a); count five); robbery of Hector Arriola with firearm allegations (§§ 211, 12022.5, subd. (a), 12022.53, subds. (b) & (g); count six); and brandishing a firearm at Robert Jordan (§ 417, subd. (a)(2)).

C. *Sanity Phase and Directed Verdict*

The case proceeded to the sanity phase, at which time the defense did not call any expert witnesses and appellant declined to testify. After hearing defense counsel's opening statement and ruling that evidence presented at the guilt phase would be admissible on the issue of sanity, the court granted the prosecution's motion for a directed verdict in its favor and found appellant to have been sane as to all counts.

---

[3] Further statutory references are to the Penal Code unless otherwise indicated.

D. *Sentence Imposed*

The trial court sentenced appellant to a life term in prison for the attempted murder of Officer Thurston, plus a consecutive term of 25 years to life for the most serious firearm enhancement allegation attached to that count. (§§ 187, subd. (a), 664, subd. (e), 12022.53, subd. (d).) It imposed the five-year lower term for the attempted murder of Atunez, plus 20 years for the most serious firearm enhancement allegation attached to that count, with the sentence for the attempted murder of Atunez to be served consecutive to the sentence for the attempted murder of Officer Thurston.[4] (§§ 187, subd. (a), 664, subd. (a), 12022.53, subd. (c).) Sentences on the remaining counts and allegations were run concurrently or stayed pursuant to section 654.

## II. DISCUSSION

A. *Attempted Voluntary Manslaughter as a Lesser Included Offense*

Appellant argues the trial court committed prejudicial error when it refused his request for jury instructions on imperfect self-defense and attempted voluntary manslaughter as a lesser included offense of the two counts of attempted murder. We disagree.

### 1. General Principles

Even without a request, a trial court must instruct the jury on general principles of law that are closely connected to the facts before the court and that are necessary for the jury's understanding of the case, including all lesser included offenses supported by substantial evidence. (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 833–834 (*Szadziewicz*).) The court need not instruct on a lesser included offense when there is no evidence the offense was less than that charged. (*Ibid*.)

---

[4] Although the trial court characterized the sentence for attempted murder of a peace officer as "seven years to life," the statutorily specified punishment for this crime is "imprisonment in the state prison for life with the possibility of parole," with appellant becoming eligible for parole after seven calendar years. (See *People v. Mejia* (2008) 159 Cal.App.4th 1081, 1083, fn. 3, overruled on other grounds in *People v. Sanchez* (2011) 53 Cal.4th 80, 90, fn. 3; § 3046, subd. (a).)

A person who kills or attempts to kill someone because he actually, but unreasonably, believes he needs to defend himself from imminent death or great bodily injury is deemed to have acted without malice. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1116; *In re Christian S.* (1994) 7 Cal.4th 768, 783; *Szadziewicz*, *supra*, 161 Cal.App.4th at pp. 833–834.) " 'Unreasonable self-defense, also called imperfect self-defense, "obviates malice because that most culpable of mental states 'cannot coexist' with an actual belief that the lethal act was necessary to avoid one's own death or serious injury at the victim's hand." ' " (*People v. Elmore* (2014) 59 Cal.4th 121, 129– 130 (*Elmore*).) In such cases, the crime committed is manslaughter or attempted voluntary manslaughter, not murder or attempted murder. (*Szadziewicz*, at p. 834.)

Imperfect self-defense is not available in all cases in which a defendant presents evidence he subjectively feared for his life. A defendant who, through his own wrongful conduct, has created circumstances under which his adversary's attack or pursuit is legally justified may not invoke imperfect self-defense. (*Szadziewicz*, *supra*, 161 Cal.App.4th at p. 834.) Additionally, imperfect self-defense is unavailable where the belief in the need to defend oneself is entirely delusional, a delusional belief being properly addressed under the rubric of an insanity defense. (*Elmore*, *supra*, 59 Cal.4th at p. 130.)

2. Analysis

Appellant was not entitled to an instruction on attempted voluntary manslaughter based on imperfect self-defense because the evidence presented at trial did not support a determination he feared imminent death or great bodily injury when he shot at Atunez and Officer Thurston. Though appellant testified that he thought Atunez had a weapon when Atunez approached him, he also testified that he did not remember firing his own gun or seeing Atunez with a gun, and there was no evidence Atunez actually had a weapon of any kind. With respect to Thurston, appellant testified, "I don't remember that incident, but I know for sure that I did not intend to shoot anybody, much less kill anybody." There was simply no evidence from which a reasonable jury could be persuaded that appellant shot at either Atunez or Thurston in " 'the actual but

6

unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury.' " (*People v. Quintero* (2006) 135 Cal.App.4th 1152, 1165–1166.)

Appellant testified that on the day of the shooting, he believed someone was going to kill him. But, other than noting that Oakland can be a dangerous place, he did not describe a belief in any specific facts that would give rise to a subjective fear of imminent death or great bodily injury, and the fear he did describe was purely a product of his paranoia. "[I]mperfect self-defense remains a species of mistake of fact [citation]; as such, it cannot be founded on delusion. In our view, a mistake of fact is predicated upon a negligent perception of facts, not, as in the case of a delusion, a perception of facts not grounded in reality. A person acting under a delusion is not negligently interpreting actual facts; instead, he or she is out of touch with reality. That may be insanity, but it is not a mistake as to any fact." (*People v. Mejia-Lenares* (2006) 135 Cal.App.4th 1437, 1453–1454.) "[U]nreasonable self-defense involves a misperception of objective circumstances, not a reaction produced by mental disturbance alone." (*Elmore*, *supra*, 59 Cal.4th at pp. 134–135, fn. omitted.)

Even if the jury could have concluded that appellant subjectively feared for his life, and that such fear was not purely the product of mental illness or delusion, he was not entitled to invoke imperfect self-defense. The incident leading to both of the attempted murder charges began when appellant robbed Arriola and took his bicycle. Having witnessed this felony, Atunez pursued appellant in an effort to recover the bicycle on behalf of Arriola, which he had the right to do so long as he did not use unreasonable force. (See §§ 835 [reasonable restraint may be used in making an arrest]; 837, subds. 1 & 3 [arrest may be made by private person "[f]or a public offense committed or attempted in his presence" or "[w]hen a felony has been in fact committed, and he has reasonable cause for believing the person arrested to have committed it"]; *People v. Fosselman* (1983) 33 Cal.3d 572, 579 [felon has no right to resist valid citizen's arrest].) Atunez did not use unreasonable (or any) force to stop appellant, but rather than submitting to Atunez or returning the bicycle, appellant shot at him. Officer Thurston had just heard shots and saw appellant running from a potential crime scene, giving him

reasonable suspicion to detain appellant, but rather than submitting, appellant fled and then shot the officer.  Having created the circumstances under which Atunez and Thurston were legally justified in pursuing him, appellant cannot invoke unreasonable self-defense to mitigate his culpability for the shootings.  (*People v. Seaton* (2001) 26 Cal.4th 598, 664; *In re Christian S., supra,* 7 Cal.4th at p. 773, fn. 1; *Szadziewicz, supra*, 161 Cal.App.4th at p. 823.)

B.  *Denial of* Pitchess *Motion*

Appellant argues that the trial court erred by denying his *Pitchess* motion seeking to discover information contained in the personnel records of three police officers. Appellant argues the case should be remanded to the trial court to conduct an in camera review of the records requested.  (See *People v. Hustead* (1999) 74 Cal.App.4th 410, 421–423 [remedy for improper denial of *Pitchess* motion].)  We reject the claim.

1.  <u>General Legal Principles</u>

In *Pitchess*, *supra*, 11 Cal.3d 531, our Supreme Court recognized that a criminal defendant may, under some circumstances, compel the discovery of information contained in a police officer's confidential personnel file that is relevant to the defense. (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1019 (*Warrick*); *People v. Mooc* (2001) 26 Cal.4th 1216, 1219.)  These procedures have since been codified in the Evidence and Penal Codes.  (*Mooc,* at pp. 1219–1220.)

Generally, peace officer personnel records "are confidential and shall not be disclosed in any criminal or civil proceeding except by discovery pursuant to Sections 1043 and 1046 of the Evidence Code."  (§ 832.7, subd. (a).)  Section 1043 of the Evidence Code requires a defendant to file a written motion for discovery of peace officer personnel files that includes "[a]ffidavits showing good cause for the discovery or disclosure sought, setting forth the materiality thereof to the subject matter involved in the pending litigation . . . ."  (Evid. Code, § 1043, subd. (b)(3).)  Once good cause has been established, the trial court must examine the material in camera to determine its relevance to the case.  (Evid. Code, § 1045.)

8

The affidavit in support of a *Pitchess* motion "must propose a defense or defenses to the pending charges. The declaration must articulate how the discovery sought may lead to relevant evidence or may itself be admissible direct or impeachment evidence [citations] that would support those proposed defenses." (*Warrick*, *supra*, 35 Cal.4th at p. 1024.) A showing of good cause requires a defendant "to establish not only a logical link between the defense proposed and the pending charge, but also to articulate how the discovery being sought would support such a defense or how it would impeach the officer's version of events." (*Id*. at p. 1021.) The affidavit must describe "a factual scenario supporting the claimed officer misconduct," but the defendant "need only demonstrate that the scenario of alleged officer misconduct could or might have occurred." (*Id*. at pp. 1016, 1024–1025.) It is not the court's role to weigh or assess the evidence or to determine whether the scenario is reasonably probable or apparently credible. (*Id*. at pp. 1025–1026.)

"A motion for discovery of peace officer personnel records is 'addressed solely to the sound discretion of the trial court.' " (*People v. Gill* (1997) 60 Cal.App.4th 743, 749.) We review a trial court's ruling for abuse of discretion. (*Ibid*.)

## 2. Procedural Background

The *Pitchess* motion filed by appellant sought the discovery of the police personnel records of Officers Thurston and Holton, who were involved in the events leading to appellant's arrest, and Sergeant James Gantt, who was alleged to have interviewed Officers Thurston and Holton regarding those events. The motion sought to discover complaints and reports about "acts indicating or constituting racial or ethnic prejudice, dishonesty, false arrest, illegal search and seizure, the fabrication of charges and/or evidence, planting evidence, or any act demonstrating a morally lax character" as well as "unnecessary acts of aggressive behavior, acts of violence and/or attempted violence, acts of excessive force and/or attempted excessive force."

The initial affidavit filed by defense counsel in support of the *Pitchess* motion alleged that appellant was Hispanic; all three police officers were African-American; a federal district court in a separate proceeding had awarded damages for illegal detentions,

9

arrests and searches by Officer Thurston and had determined he was not a credible witness; and "Officer . . . Holton may be a percipient witness as will Sgt. Gantt as to the results of the investigation."

A second affidavit submitted by defense counsel stated: "The evidence may show that Officer Thurston's [*sic*] failed to adequately identify himself as a police officer, that he gave no warning before pulling his own weapon and aiming it in the general direction of [appellant], and that [appellant] feared for his life, rightfully so after Thurston did so; and that [appellant's] actions were fully justified by Thurston's illegal activity; Officer Thurston was inadequately trained in how to conduct police business with mentally ill or hearing impaired persons, that Thurston acted improperly due to this inadequate training . . . that [Officer] Holton will lie and say he was [a] percipient witness and on the scene when Officer Thurston so behaved; and that Holton is an employee of OPD [(Oakland Police Department)] and will lie to protect his employer; that Sgt. Gantt is specially trained by OPD to cover up illegal activity such as that by Officer Thurston; and that instead of punishing Thurston, he is being allowed to retire on a full pension due to his own illegal conduct."

A third affidavit detailed Officer Thurston's pursuit of appellant after he heard shots fired, as well as Officer Holton's firing of three shots, and alleged that Thurston told Holton to "Shoot that motherfucker[,] he just shot me." "[T]he thrust of this case is the stop and detention of [appellant] by first on the scene Officer Thurston; Officer Thurston's actions, and statements to [appellant] will be crucial to a defense that [appellant] was either shot or mentally impaired due to [a] 5150 call; he was then approached without due caution in a manner that constituted an improper stop under the circumstances, and when [appellant] hid behind a car due to extreme fear of a man jumping out of a car and running in his direction, he perceived the man to be increasingly threatening by drawing a weapon, and [appellant] responded, perhaps imperfectly. . . on self-defense shot first. [*Sic*.] The officer did not identify himself as a police officer nor did he ask for appropriate medical help for [appellant]." The affidavit asserted that

10

Thurston, Holton, and Gantt "will be motivated to paint a picture with testimony, that [appellant] initiated the incident without justification; the opposite is true. . . ."

The court held a hearing on the *Pitchess* motion. After a thorough discussion with defense counsel concerning the facts of the case and the nature of appellant's proposed defense, the court determined the allegations in the affidavits did not supply good cause for disclosure of the police personnel records. It denied the *Pitchess* motion without prejudice, and the motion was not renewed.

### 3. Analysis

The trial court did not abuse its discretion in concluding there was no good cause for disclosure of the police personnel records sought by appellant. We observe at the outset that while the affidavits suggested the three African-American officers might have a bias against appellant, who is Hispanic, nothing in this case hints that race or ethnicity were factors in the decision to pursue appellant.[5]

Although the *Pitchess* motion and supporting affidavits repeatedly assert that Officer Thurston had a history of making unreasonable detentions, arrests and searches, the misconduct alleged in this case was Thurston's approach "without due caution" of a mentally ill suspect who had just fired a gun, at which point the suspect (appellant) shot Thurston. The initial gunshots and appellant's flight from the area gave Thurston sufficient cause to pursue appellant and use reasonable force if necessary to detain him. Approaching appellant "without due caution" would not be a defense to the attempted murder or assault charges involving Thurston. Moreover, the affidavits do not explain how Thurston could have been expected to know that appellant was mentally ill, or how he could have taken a different course of action to avoid the confrontation, other than giving up the chase and allowing appellant to escape. (See *People v. Thompson* (2006) 141 Cal.App.4th 1312, 1316 [*Pitchess* motion properly denied in case where affidavit did not "present a factual account of the scope of the alleged police misconduct" or explain

---

[5] Officer Thurston testified at trial that he had broadcast a description of the fleeing suspect as a "light-black male" rather than Hispanic.

11

the defendant's actions in a manner that supported his defense].) Any prior misconduct by Thurston or deficiencies in his training were immaterial given the nature of the charges against appellant and the circumstances of the case.

The allegations were even weaker with respect to Officer Holton and Sergeant Gantt. The affidavits did not allege any specific misconduct by these officers, but made only speculative assertions that by virtue of their employment with the Oakland Police Department, they would lie to cover up any illegal activity by Officer Thurston. These allegations fall short of establishing a "plausible factual foundation" of police misconduct, such that the discovery sought was material to the litigation. (See *City of San Jose v. Superior Court* (1998) 67 Cal.App.4th 1135, 1146–1147.)

Even if we were to conclude the affidavits demonstrated good cause for an in camera review of the officers' personnel records, the failure to conduct such a review was harmless. Officer Holton testified at trial that he did not see the events leading to appellant shooting Officer Thurston, so the speculation in the *Pitchess* motion that he would lie to protect Thurston was not borne out. Sergeant Gantt did not even testify at trial. Thurston's testimony that he was essentially ambushed by appellant while getting out of his patrol car was not contradicted and there was no evidence suggesting he unlawfully detained appellant or used unreasonable force in effecting a detention or arrest so as to warrant appellant's use of deadly force to resist. Even if we assume the personnel records contained some matter that might have been admissible to impeach the testifying officers' general credibility or show a lack of proper training in approaching mentally ill subjects, there is no reasonable probability appellant would have obtained a more favorable outcome had those records been disclosed. (See *People v. Samuels* (2005) 36 Cal.4th 96, 110.)

C. *Directed Verdict on Sanity*

Appellant finally argues the case must be remanded for a new trial on the issue of sanity because the trial court erred in granting a directed verdict in favor of the prosecution. We disagree.

1. Procedural Background

After the case was submitted to the jury at the conclusion of the guilt phase, appellant advised the court he was dissatisfied with his defense counsel and the court held a hearing to consider appointing substitute counsel under *People v. Marsden* (1970) 2 Cal.3d 118. The court denied the motion and appellant does not challenge that ruling in this appeal. At the commencement of the sanity phase, appellant would not talk to his defense counsel and indicated he wished to speak to the court about testifying. The court explained that the burden of proof was on appellant to show insanity by a preponderance of the evidence ("more likely than not"), that it was up to appellant to decide whether to take the stand, and that if he did not take the stand the jury could consider evidence from the guilt phase to determine whether he was insane at the time of his crimes, assuming there was sufficient evidence of insanity for the case to go to the jury.

After the court spoke to appellant, defense counsel gave her opening statement to the jury. Appellant declined to testify and counsel did not call any other witnesses. The court indicated it would allow the jury to consider evidence presented during the guilt phase of the trial, and the prosecutor made a motion for a directed verdict, arguing the guilt phase evidence would not support a determination that appellant was legally insane when he committed the offenses. The trial court granted the motion.

2. General Principles

" ' "The test of legal insanity in California is the rule in *M'Naghten's Case* (1843) 10 Clark & Fin. 200, 210 [8 Eng. Rep. 718, 722], as adopted by the electorate in June 1982 with the passage of Proposition 8. That measure added section 25, subdivision (b) [to the Penal Code], which provides: 'In any criminal proceeding . . . in which a plea of not guilty by reason of insanity is entered, this defense shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense.' Despite the use of the conjunctive 'and' instead of *M'Naghten's* disjunctive 'or,' this court has interpreted the statute as recognizing two distinct and independent

13

bases on which a verdict of not guilty by reason of insanity might be returned." (*People v. Lawley* (2002) 27 Cal.4th 102, 169–170, fn. omitted.) "The incapacity must be based on a mental disease or defect even though that requirement is not specifically mentioned in [section] 25, subd[ivision] (b)." ' " (*People v. Blakely* (2014) 230 Cal.App.4th 771, 774 (*Blakely*).)

Section 29.8 (formerly section 25.5) provides the following limitation on an insanity defense: "In any criminal proceeding in which a plea of not guilty by reason of insanity is entered, this defense shall not be found by the trier of fact solely on the basis of a personality or adjustment disorder, a seizure disorder, or an addiction to, or abuse of, intoxicating substances." "This limitation has been interpreted to establish 'an absolute bar prohibiting use of one's voluntary ingestion of intoxicants as the *sole* basis for an insanity defense, regardless of whether the substances caused organic damage or a settled mental defect or disorder which persists after the immediate effects of the intoxicant have worn off.' [Citation.] Thus, there can be no insanity defense when the inability to tell right from wrong derived (1) solely from an addiction or abuse of intoxicating substances, *or* (2) from a mental defect or disorder that itself was caused solely by such addiction or abuse." (*People v. Cabonce* (2009) 169 Cal.App.4th 1421, 1433–1434, fn. omitted, italics added by *Cabonce*.)

A trial court has the inherent ability to direct a verdict and remove an insanity defense from the jury when there is no evidence to support it. (*Blakely*, *supra*, 230 Cal.App.4th at p. 775; *People v. Severance* (2006) 138 Cal.App.4th 305, 315–318 (*Severance*); *People v. Ceja* (2003) 106 Cal.App.4th 1071, 1089.) This is because "[a] plea of not guilty by reason of insanity 'is a statutory defense that does not implicate guilt or innocence but, instead, determines "whether the accused shall be *punished* for the *guilt* which has already been established." ' " (*Blakely*, at p. 775.) Taking the issue of sanity away from the jury does not violate the federal constitution. (*Severance*, at p. 318.)

We review de novo a directed verdict on the issue of sanity. (*Severance*, *supra*, 138 Cal.App.4th at p. 319.) " 'A nonsuit or a directed verdict may be granted "only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to

14

which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given." ' " (*Blakely*, *supra*, 230 Cal.App.4th at p. 775.) "[W]e do not look for substantial evidence in support of the trial court's ruling that defendant was sane; rather, we look for substantial evidence from which the jury reasonably could have found defendant was *not* sane. If we find such evidence, then a directed verdict of sanity was improper." (*Severance*, *supra*, 138 Cal.App.4th at p. 320.)

2. Analysis

Appellant argues that a reasonable jury could have determined from his testimony during the guilt phase that he was legally insane when he committed the charged offenses. He notes that he chronicled a long history of substance abuse resulting in paranoia, delusions, hallucinations and panic attacks, and testified that psychotropic drugs administered in jail had alleviated these symptoms. In particular, appellant described feelings of paranoia on the day of the shooting and an overwhelming desire to leave Oakland because he believed someone was going to kill him.

We are not persuaded. Appellant's testimony would support a determination he suffered from a mental disease or defect that caused him to be paranoid. But no substantial evidence was presented that as a result of this mental disease or defect, appellant was incapable of "knowing or understanding the nature and quality of his acts" or "distinguishing right from wrong" at the time he committed his crimes. (*Blakely*, *supra*, 230 Cal.App.4th at p. 779.) Appellant never testified to this effect and no expert witness offered an opinion regarding appellant's mental state, much less an opinion that he was insane at the time of the offenses. (*Ibid.* [directed verdict for prosecution properly granted on issue of sanity where defendant did not testify that what he was doing was morally correct or that he did not understand the difference between right and wrong and the only expert to testify did not form an opinion].) As in *Severance*, *supra*, 138 Cal.App.4th at page 323, in which the court upheld a directed verdict on the issue of sanity, "the evidence simply did not speak to that point."

15

Nor was any evidence presented from which a jury could determine that appellant suffered from a mental disease or defect that was *not* the product of addiction or the use of intoxicating substances. The only mental health professional called as a witness during the guilt phase was Dr. Berke, and his testimony on rebuttal was limited to describing prior interview statements made by appellant that tended to show appellant remembered the shootings, contrary to his testimony at trial. Appellant testified that he had used a number of different drugs from the time he was a teenager, and indicated his paranoia had set in when he started using crack cocaine. He also described having delusions and hallucinations "[o]nly when I was on drugs and up for a few days."

The recent decision in *People v. Leeds* (2015) 240 Cal.App.4th 822 , to which appellant directs our attention, is inapposite. In *Leeds*, five mental health professionals testified that the defendant had been insane when he committed four murders because he had been operating under a delusion that the victims were part of a Mexican drug cartel that wanted to kill him. (*Id*. at p. 827.) The jury found the defendant sane as to all four counts, but the appellate court reversed as to one count for which evidence was presented that the defendant shot the victim in response to a perceived imminent lethal threat. The court concluded the jury instructions were erroneous because they suggested the defendant's belief in an imminent threat must be reasonable for the insanity defense to apply, whereas the appropriate question was whether, due to his mental disease or defect, the defendant actually believed he was in imminent danger of suffering death or great bodily injury. (*Id*. at pp. 832–833.) The analysis in *Leeds*, which involved an instructional error in a case where five experts testified the defendant was insane, does not assist appellant in his effort to show that the evidence in his case was sufficient to withstand a directed verdict.

## III.  DISPOSITION

The judgment is affirmed.

_____
NEEDHAM, J.

We concur:


_____
SIMONS, Acting P.J.


_____
BRUINIERS, J.

(A144404)

17

18