Filed 10/16/14

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D066381 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FVA1000603) |
| ANTHONY JOHN BLAKELY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Ingrid A. Uhler, Judge. Affirmed.

Ellen M. Matsumoto, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Marilyn L. George, Deputy Attorneys General, for Plaintiff and Respondent.

Anthony John Blakely pleaded not guilty and not guilty by reason of insanity to assault with a deadly weapon (Pen. Code,[1] §§ 245, subd. (a)(1); 1192.7, subd. (c); count 1) and robbery (§ 211; count 2).  The jury convicted him of both counts.  After the evidence was presented in the sanity phase of the trial, the court granted the People's motion for a directed verdict of sanity.

Blakely appeals, contending the court erred in directing a verdict of sanity.  We conclude the court did not err in removing the issue of Blakely's sanity from the jury.  As set forth in *People v. Severance* (2006) 138 Cal.App.4th 305, 320 (*Severance*), the court properly directs a verdict of sanity when a defendant fails to proffer "substantial evidence from which the jury reasonably could have found the defendant was *not* sane."  (Original italics.)  The evidence in this case was insufficient for the jury to make such a finding.  Accordingly, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In April 2010, Samuel Lamar went to a supermarket in Rialto.  Blakely and a female companion were in line to the left of Lamar and watched as Lamar paid for his groceries with a 100 dollar bill.  Blakely appeared nervous and stared at Lamar.  Lamar ignored Blakely and put the change from his purchase, about $70, into his pocket and left the store.

Without purchasing anything, Blakely left the store and followed Lamar into the parking lot.  As Lamar was putting the groceries into his truck, Blakely attacked him.

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

Blakely hit Lamar in the face with a metal object, then pushed him into his truck and said, "You're going to pay."

Blakely hit Lamar two more times in the head with the object. Blakely pulled Lamar out of the truck, pushed him to the ground, and slammed his head on the pavement. Blakely stood there "rocking back and forth, breathing extremely hard," then grabbed Lamar and said, "Give me your money." Blakely took the money from Lamar's pocket and ran away.

After the jury found Blakely guilty on counts 1 and 2, and in a bifurcated trial also found he suffered two prior strike convictions for burglary (§§ 459, 1192.7, subd. (c) & 667.5, subd. (c)), the same jury remained for the sanity phase of the trial. After both sides presented their evidence, the court granted the People's motion for a directed verdict of sanity. The court subsequently sentenced Blakely to prison for 35 years to life.

## DISCUSSION

Blakely contends that the court erred in directing a verdict of sanity because he presented sufficient evidence for the jury to reasonably conclude he was insane at the time of the crimes. We disagree.

## I

### *LEGAL PRINCIPLES*

A. Test for Insanity and Power to Direct a Verdict of Sanity

" 'The test of legal insanity in California is the rule in *M'Naghten's Case* (1843) 10 Clark & Fin. 200, 210 [8 Eng.Rep. 718, 722], as adopted by the electorate in June 1982 with the passage of Proposition 8. That measure added section 25, subdivision (b)

3

[to the Penal Code], which provides: "In any criminal proceeding . . . in which a plea of not guilty by reason of insanity is entered, this defense shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense." Despite the use of the conjunctive "and" instead of *M'Naghten's* disjunctive "or," this court has interpreted the statute as recognizing two distinct and independent bases on which a verdict of not guilty by reason of insanity might be returned.' (*People v. Lawley* (2002) 27 Cal.4th 102, 169-170, fn. omitted.) 'The incapacity must be based on a mental disease or defect even though that requirement is not specifically mentioned in [Penal Code section] 25, subd[ivision] (b).' " (*Severance, supra,* 138 Cal.App.4th 305, 321-322.)

A plea of not guilty by reason of insanity "is a statutory defense that does not implicate guilt or innocence but, instead, determines 'whether the accused shall be *punished* for the *guilt* which has already been established.' [Citations.]" (*People v. Hernandez* (2000) 22 Cal.4th 512, 528 [Brown, J., conc.]; original italics.) Because a plea of insanity is an affirmative defense in which the defendant has the burden of proof, the court may, through the grant of a directed verdict, "remove the issue of sanity from the jury when the defendant has failed to present evidence sufficient to support the special plea." (*People v. Ceja* (2003) 106 Cal.App.4th 1071, 1089; see also *Severance*, *supra*, 138 Cal.App.4th at p. 324 [noting the court properly directed a verdict of sanity because even if credited and viewed in the light most favorable to the defendant, he failed to proffer sufficient evidence of legal insanity, including evidence providing a substantial

4

basis for the jury to find that when he committed the crimes he believed his actions were morally acceptable].)

## B. Standard of Review

The appropriate standard of review is the one for a directed verdict. (*Severance*, *supra*, 138 Cal.App.4th at p. 319.) Under that standard, we review the trial court's decision de novo. (*Ibid.*) "It has become the established law of this state that the power of the court to direct a verdict is absolutely the same as the power of the court to grant a nonsuit. A nonsuit or a directed verdict may be granted 'only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given.' [Citations.] Unless it can be said as a matter of law, that, when so considered, no other reasonable conclusion is legally deducible from the evidence, and that any other holding would be so lacking in evidentiary support that a reviewing court would be impelled to reverse it upon appeal, or the trial court to set it aside as a matter of law, the trial court is not justified in taking the case from the jury. [Citation.] A motion for a directed verdict 'is in the nature of a demurrer to the evidence, and is governed by practically the same rules, and concedes as true the evidence on behalf of the adverse party, with all fair and reasonable inferences to be deduced therefrom. . . . The power of a court in passing upon such motions is strictly limited. It has no power to weigh the evidence, but is bound to view it in the most favorable light in support of the verdict. . . .' [Citation.] In other words, the

5

function of the trial court on a motion for a directed verdict is analogous to and practically the same as that of a reviewing court in determining, on appeal, whether there is evidence in the record of sufficient substance to support a verdict. Although the trial court may weigh the evidence and judge the credibility of the witnesses on a motion for a new trial, it may not do so on a motion for a directed verdict." (*In re Estate of Lances* (1932) 216 Cal. 397, 400-401.)

"Thus, we do apply the substantial evidence standard of review, but in doing so we do not look for substantial evidence in support of the trial court's ruling that defendant was sane; rather, we look for substantial evidence from which the jury reasonably could have found defendant was *not* sane. If we find such evidence, then a directed verdict of sanity was improper." (*Severance*, *supra*, 138 Cal.App.4th at p. 320; original italics.)

Here, the question before us is whether Blakely offered sufficient evidence for a jury to reasonably conclude that, based on a mental disease or defect, he was incapable of: (1) knowing or understanding the nature and quality of his acts; or (2) distinguishing right from wrong when he attacked and robbed Lamar in April 2010. (See *Severance*, *supra*, 138 Cal.App.4th at p. 322.)

## II

### *EVIDENCE FROM SANITY PHASE AND THE TRIAL COURT'S RULING*

Blakely called Lamar as a witness to describe Blakely's behavior on the night of the attack. When Blakely stood near Lamar in the grocery store checkout line, Lamar testified he saw Blakely "jumping back and forth, side to side [and] staring." Lamar also testified that before Blakely attacked him, Blakely looked like he was "having some

6

second thoughts."  Finally, Lamar testified Blakely was "rocking back and forth . . . practically out of breath" after the attack.

Psychologist Chuck Leeb examined Blakely in February 2012, and testified on Blakely's behalf.  Dr. Leeb opined that Blakely suffered from "paranoid schizophrenia or schizoaffective disorder, paranoid type," but was unable to form an opinion about Blakely's sanity in April 2010 when he committed the crimes.

Dr. Leeb interviewed Blakely for approximately 90 minutes.  He concluded that Blakely was operating at the low end of the average range or at the upper end of the mental retardation range.  Blakely told Dr. Leeb during the interview he heard voices, explaining the voices, "[T]ell [him] to hurt people.  They tell [him] to kill [himself]. They tell [him he is] no good."  Blakely also told Dr. Leeb that he had visual hallucinations; he would see trains and cars and talk to his deceased father.  Blakely was on several medications during the interview, including an antipsychotropic and an antidepressant, and another that helped alleviate the side effects of the other medications.

Blakely had a difficult time recalling events during the interview.  Dr. Leeb testified that memory loss could be a symptom of a person who is actively hallucinating. Dr. Leeb also considered the possibility that Blakely's sporadic memory could have been caused by an injury he suffered from a bullet wound to the frontal area of his forehead.

When Dr. Leeb asked Blakely about the assault and robbery in 2010, Blakely stared blankly and said, "I don't know," and "I don't remember."  Dr. Leeb received no additional information about the circumstances of the April 2010 attack, and therefore, as noted, could not form any opinion about Blakely's sanity.  If Dr. Leeb had more

7

information he would have been able to form an opinion. When defense counsel asked Dr. Leeb if it would affect his opinion had he known Blakely rocked back and forth after attacking Lamar, Dr. Leeb stated that rocking back and forth is "pretty common behavior" for a person in a schizophrenic episode.

Blakely also testified at the sanity hearing. He testified that he was diagnosed with schizophrenia when he was 15 or 16 years old and that he was hospitalized twice for this disorder. He stated he has taken medications for schizophrenia since his diagnosis and was taking those medications on the night he attacked Lamar. Blakely also stated that he smoked marijuana dipped in PCP and used crystal methamphetamine on the day of the attack and that he has used these drugs "almost every day" for 10 to 15 years up until the attack on Lamar.

Blakely testified he remembers getting "in a fight" on the night he attacked Lamar. He also remembers that he and a woman went to the supermarket to "buy candies" so they could "come down." Blakely started hearing voices, which said, "There he is right there," referring to Lamar. To Blakely, the voices meant that Lamar was "the demon." Lamar looked like a demon with a "funny face and big body and his feet had some like hooves or something like that."

Blakely testified that he did not recall hitting Lamar with an object. He also testified that when he was 13 or 14 years old, he was shot in the head above his eyebrow, which caused him to be in a coma for seven months. He did not remember talking to Dr. Leeb at all.

8

The prosecution in response presented the testimony of an expert, forensic psychologist Christopher Michael. Dr. Michael evaluated Blakely in March 2012. Dr. Michael opined Blakely at the time of the attack was legally sane under the *M'Naghten* standard. In reaching this conclusion, Dr. Michael administered a test to Blakely and the results suggested that Blakely may have exaggerated or intentionally produced some of his symptoms during the evaluation. Notably, Blakely never told Dr. Michael that he believed Lamar looked like a demon on the night of the attack. Blakely also gave inconsistent accounts of his substance abuse at the time of the crime.[2]

Dr. Michael further testified that Blakely's behavior on the night of the attack, watching Lamar pay for his groceries with a 100 dollar bill then whispering to his female companion, indicated calm, orderly behavior. Dr. Michael also reviewed the police interrogation video where Blakely was able to silence himself strategically, use "reason," and not confess when the officer used a ruse on him. Dr. Michael also considered a recorded jailhouse phone call between Blakely and his sister where Blakely used humor and made no mention of symptoms of a mental illness, but did discuss the legal strategy of why Blakely was likely to take an insanity defense.

Following Dr. Michael's testimony, the People orally moved for a directed verdict of sanity, contending there was insufficient evidence to support Blakely's insanity defense. The prosecutor agreed there was sufficient proof Blakely suffered from a mental disease or defect, but argued there was no proof that Blakely believed he "was morally

---

[2]    Blakely told Dr. Michael that he was under the influence of drugs at the time of the crime, but denied being under the influence during the initial police interrogation.

9

justified" in attacking and robbing Lamar.  The prosecutor highlighted the fact that none of Blakely's witnesses "[made] the connection to the second element of the insanity instruction."

Defense counsel objected to the motion, asserting there was sufficient evidence for the jury to consider the issue because "Dr. Leeb testified that there was ambiguity and if he had had this information, he may have made an alternative determination."

The trial court, relying on *Severance, supra,* 138 Cal.App.4th 305 as authority, granted the People's motion, ruling as follows:

> "[T]here's absolutely no evidence whatsoever either through [Blakely's] testimony and/or any expert testimony to give any information to the jurors that he was incapable of knowing or understanding the nature and quality of his acts.  [¶] And, again, I don't believe there's any evidence to indicate that he believed that his conduct was morally right. . . .  I'm going to find for the People.  I'm going to find there is not sufficient evidence.  There is no ambiguity. We have one doctor that can't form any opinion.  He never formed any opinion whatsoever.  And then we have another doctor that was not discredited, that formed the opinion that he was sane at the time of the commission of the offense, and we have the fact that [Blakely] never testified whatsoever that he did not know the difference between right and wrong, nor did he feel that his actions were morally correct."

In making its ruling, the court found the facts of *Severance*, *supra*, 138 Cal.App.4th at page 305 analogous to Blakely's case, noting that Blakely "never testified that he thought . . . what he was doing was morally correct or that he did not understand the difference between right and wrong, which was very similar to the defendant's statement in the *Severance* case."  Finally, the court recounted Blakely's conduct,

concluding that the circumstances of the offenses and Blakely's subsequent flight indicate that he knew right from wrong.

III

*ANALYSIS*

As we previously noted, it was Blakely's burden to proffer "sufficient evidence for a jury to reasonably conclude that, based on a mental disease or defect, he was incapable of: (1) knowing or understanding the nature and quality of his acts; or (2) distinguishing right from wrong when he" assaulted then robbed Lamar.  (See *Severance*, *supra*, 138 Cal.App.4th at p. 322.)

Blakely relies only on the second element of the *M'Naghten* test contending he was incapable of distinguishing right from wrong when he committed the crimes.  (See *People v. Stress* (1988) 205 Cal.App.3d 1259, 1272 [a defendant is legally insane if, because of a mental disease or defect, he is incapable of distinguishing the moral rightness or wrongness of his act, regardless of whether he knows his actions are illegal].)  Blakely contends there was sufficient evidence for the jury to find he believed that it was morally right to "rid the world of Lamar" because he presented evidence of a mental illness and he testified he heard voices telling him Lamar was a demon.

We are not persuaded.  While we acknowledge Blakely presented evidence that he suffered from paranoid schizophrenia, he did not present sufficient evidence for the jury to reasonably conclude he was incapable of distinguishing the moral rightness or wrongness of his actions when he attacked and robbed Lamar.

11

The facts here are similar to that in *Severance*, *supra*, 138 Cal.App.4th 305 at page 318, where the court held a directed verdict of sanity was proper because there was no substantial evidence to prove the defendant was legally insane at the time he committed the offenses. The defendant there committed a series of store robberies. (*Id.* at p. 309.) The defendant testified during the sanity phase and claimed he robbed the stores because "when he is hit on the head he becomes paranoid and schizophrenic, Satan takes control of his mind and body, and he does things he does not normally do." (*Id.* at p. 322.) He also testified that he took psychotropic medications given to people who hear voices. (*Ibid.*) The defendant argued this evidence was sufficient for the jury to find he was insane "because they could have concluded he was suffering from a delusion that his conduct was morally correct." (*Id.* at p. 323.) However, because "there was no evidence about what [the] defendant believed or did not believe" with respect to the moral rightness or wrongness of his actions at the time of the robberies, the court there concluded the evidence was insufficient to support an insanity defense. (*Id.* at p. 324.)

Similar to the facts of *Severance, supra*, 138 Cal.App.4th 305, here there was no evidence about what Blakely believed or did not believe was morally correct at the time he attacked Lamar. Of the two experts that testified, neither expert presented any evidence that Blakely believed it was morally right to attack and rob Lamar. As noted, the defense expert, Dr. Leeb, formed no opinion about Blakely's sanity at the time of the crimes. Dr. Leeb spent 90 minutes interviewing Blakely, but Blakely gave him no information about his beliefs on the night of the attack, instead telling Dr. Leeb he could not remember. The other expert, Dr. Michael, concluded that Blakely was legally sane at

12

the time of the attack based on a number of factors. In sum, the experts provided no evidence which would show Blakely on the night of the attack was incapable of distinguishing right from wrong.

Blakely testified that he suffered from schizophrenia most of his life and was taking psychotropic medications at the time of the crimes. He claimed that when he stepped outside the supermarket he heard voices say, "[t]here he is right there," referring to Lamar. Blakely believed the voices meant Lamar was "the demon." Based on this evidence, Blakely contends "the jurors could have found that because of his delusional state, [he] had a moral imperative to rid the world of Lamar, who was the devil." Thus, Blakely's claim is that he suffered an insane delusion which rendered him incapable of distinguishing right from wrong.

We disagree. "If [a] mental illness is manifested in delusions which render the individual incapable either of knowing the nature and character of his act, or of understanding that it is wrong, he [or she] is legally insane under the California formulation of the M'Naghten test." (*People v. Skinner* (1985) 39 Cal.3d 765, 782 (*Skinner*).)

In *Skinner*, the defendant, suffering from paranoid schizophrenia, killed his wife. (*Skinner*, *supra*, 39 Cal.3d at p. 770.) He presented evidence that he believed "that the marriage vow 'till death do us part' bestows on a marital partner a God-given right to kill the other partner who has violated or was inclined to violate the marital vows, and that because the vows reflect the direct wishes of God, the killing is with complete moral and criminal impunity. The act is not wrongful because it is sanctified by the will and desire

13

of God." (*Ibid.*) Our Supreme Court concluded such evidence was "clearly sufficient" to show that the defendant was incapable of distinguishing right from wrong when he committed the crime. (*Id.* at p. 784.)

Here, unlike the record in *Skinner, supra,* 39 Cal.3d 765, there is no evidence in the record before us from which a jury could reasonably conclude that Blakely believed his crimes were morally justified. Although Blakely testified he suffered from a delusion that Lamar was a demon, at no point during his testimony did Blakely state that he believed it was morally acceptable to attack Lamar and take his money. Without such evidence, Blakely cannot establish by the preponderance of the evidence the test for insanity.

In conclusion, the evidence, even if credited and viewed in the light most favorable to Blakely, was insufficient for a reasonable jury to conclude he was incapable of distinguishing right from wrong when he attacked and robbed Lamar in April 2010. As such, we independently conclude the court did not err when it granted the People's motion for a directed verdict of sanity.

14

DISPOSITION

The judgment is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

HALLER, J.

McINTYRE, J.

15