Filed 8/27/25  P. v. Shi CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B338116 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA453092) |
| v. | |
| DEYUN SHI, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jared D. Moses, Judge.  Affirmed.

Alan S. Yockelson and John Bishop, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kim Aarons and Louis W. Karlin, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Deyun Shi appeals from his conviction for two counts of first degree murder and one count of injuring a spouse. Defendant argues the trial court's directed verdict on his insanity defense violated his right to a jury trial under the Sixth Amendment and Due Process Clause. He also contends that he presented sufficient evidence in support of his not guilty by reason of insanity plea to submit the issue to the jury. We conclude that where a defendant fails to present substantial evidence to support his insanity defense, the trial court may direct a verdict on sanity without violating the defendant's constitutional rights. As defendant did not present evidence to support a finding that he was incapable of (1) knowing or understanding the nature and quality of his acts or (2) distinguishing right from wrong when he committed the crimes, the court did not err in granting the directed verdict on sanity. We thus affirm defendant's convictions.

## BACKGROUND

On the evening of January 21, 2016, defendant attacked his wife, Amy,[1] with a hammer while she was asleep in bed. The bludgeoning was interrupted by the couple's teenage son, and defendant fled. Hours later, in the early morning of January 22, 2016, defendant murdered his teenage nephews, William and Anthony.

---

[1] We refer to the victims and witnesses by their first or commonly used names throughout the opinion as these were the names generally used at trial.

Defendant and Amy are no longer married.

2

Subsequently, a grand jury indicted defendant for the murders of his nephews (counts 1 and 2) in violation of Penal Code[2] section 187, subdivision (a), with special circumstance allegations that defendant personally used a deadly and dangerous weapon (a bolt cutter) to commit the offenses (§ 12022, subd. (b)(1)). The indictment's third count charged defendant with injuring a spouse in violation of section 273.5, subdivision (a), with special circumstance allegations that he personally inflicted great bodily injury upon her (§ 12022.7, subd. (e)) and used a deadly and dangerous weapon, a maul, to do so (§ 12022, subd. (b)(1)). Defendant pled not guilty and not guilty by reason of insanity.

Defendant's trial was divided into guilt and sanity phases. After the jury found defendant guilty of the first degree murder of his nephews and of injuring his spouse, the court then held the insanity phase of the trial.

Below, we describe the evidence introduced at each phase of trial, the court's directed sanity verdict, and sentencing.

## I. The Prosecution's Evidence During the Guilt Phase of Trial

The People presented testimony from Amy, Amy's brother (David), Amy's sister-in-law (Vicki), defendant's eldest son (Torres), law enforcement, airline employees, and experts during the guilt phase of the trial establishing the following events.

Defendant and his wife, Amy, moved to Southern California from China in 2014, with their two sons. Defendant had a long history of physically abusing Amy in China, and the abuse

---

[2]   All subsequent undesignated statutory references are to the Penal Code.

3

continued when the family moved to California. In 2015, the family moved to a home in La Canada.

Amy's older brother, David, his wife Vicki, and their two children—the murder victims—William and Anthony, lived nearby in Arcadia. Defendant disliked Amy's family, and was often angry with Amy for spending time with David and other family members.

In November 2015, defendant became enraged and attempted to suffocate Amy with a pillow when he saw messages to David on Amy's cellphone expressing her unhappiness with her life. Later that month, defendant told Amy he was angry about the amount of time David spent helping her. On another occasion, defendant spat in Amy's face and cursed her family. When David asked him not to spit on Amy, defendant responded that he was "going to harm [Amy] even more in the future." Defendant also cursed at David and threatened to fight him.

The following month, Amy and her mother went grocery shopping together. When defendant found out they were together, he became angry and called Amy's cellphone, asking where she was and what she was doing. Defendant then demanded that Amy accompany him to a dental appointment. Amy refused because she feared defendant, who sounded irate. When Amy, her mother, and David later encountered defendant at her mother's home, defendant grabbed Amy and attempted to force Amy into his car, a GMC Yukon. David called 911, and defendant punched David in the face. Defendant then pushed Amy's mother to the ground, grabbed her by the legs, and began dragging her into the street.

Although the police responded, both Amy and her family declined to press charges. Amy's mother was transported to the

4

hospital by ambulance for her injuries. Defendant, claiming he was injured, had Amy drive him to the hospital as well. Afterward, she drove him back to her mother's house to retrieve his car. That night, Amy stayed with her mother because she was too afraid to return home with defendant. This angered defendant, who began angrily shouting. When the landlord came outside and threatened to call the police, defendant left. Defendant later returned to his mother-in-law's home with their two children and tried to use them to gain entry.

The next day, David took Amy to the Pasadena courthouse and obtained a temporary restraining order against defendant, which required him to move out of their home. After the order was served on defendant, Amy moved back into her home, changed the locks, and with David's assistance, sought legal advice about divorcing defendant. Despite the restraining order, defendant continued to send Amy emails and text messages attempting to reconcile with her.

On January 21, 2016, when at court for the restraining order, defendant learned that Amy had filed for divorce. That evening, Amy and their nine-year-old son slept in Amy's bedroom, while their 16-year-old son, Torres, was in his own room studying. Defendant appeared at Torres's window and asked to be let in through a door or window to talk with Amy. When the teen opened a door, the home alarm sounded and defendant fled. Torres told Amy that he opened a window by accident. She reset the alarm and went back to sleep.

At 11:00 p.m., the alarm sounded again. Amy awoke to defendant standing in front of her, holding a hammer. Defendant struck Amy's head with it five or six times, before Torres entered the bedroom and pulled defendant away from Amy. Amy called

5

911.  Defendant told Torres that defendant needed to get away fast, before the police arrived.  Throughout Torres's encounter with defendant, defendant appeared coherent and not under the influence of a delusion or hallucination.  An ambulance transported Amy to the hospital, where doctors treated her for a broken nose and multiple lacerations to her scalp and neck.

David and Vicki went to the hospital to see Amy, leaving their teenage sons at home.  The gate to their house was locked with a padlock.  Anthony was sleeping; William was studying.  While at the hospital, David checked on William by text message.  Between 1:00 and 2:00 a.m., William responded, "Don't worry, Daddy.  Take your time."  When Amy was discharged at approximately 3:10 a.m., David and Vicki drove Amy back to their home.

Upon arriving at David and Vicki's home, they observed defendant's Yukon parked nearby with its license plates missing.  Vicki called 911.  While she was on the line, a person dressed in black walked around the back of the Yukon.  He appeared to change clothes before entering the vehicle and driving away.

Before entering the home, the trio drove to Amy's mother's home to check on her, then to a drug store to pick up Amy's medication, and finally back to David and Vicki's home, arriving between 4:00 and 5:00 a.m.  David and Vicki went to their bedroom without checking on their sons; Amy rested on the living room couch.  A few hours later, David drove Amy to her mother's house, then to meet with an attorney, and finally to the Sheriff's station.  Upon waking, Vicki went looking for her sons.  She found William's dead body wrapped in a sheet and called David and 911.

6

Police officers found the two brothers' bodies in their separate bedrooms.  Both were covered by sheets or blankets and their rooms were in disarray.  A bloody pipe was on the floor.  Two walls of 15-year-old Anthony's bedroom were covered in blood spatter.  He had suffered four to five fatal blunt force injuries consistent with bolt cutters to the head and face, and innumerable lacerations to his back.  Sixteen-year-old William's fatal wounds were similar, although he had also received blunt force trauma to his forearms and hand, indicative of defensive wounds.

Los Angeles International Airport (LAX) parking lot footage showed defendant's Yukon without license plates entering at 5:12 a.m. on the morning of the killings.  Police discovered the license plates, a plastic bag of men's clothes, paper towels stained with blood and human tissue, a bloodstained pair of shoes, and bolt cutters wrapped in a towel inside the vehicle.  The Yukon's driver side interior was blood-stained.  DNA testing connected all the items and interior blood stains to defendant, Amy, and/or William.  LAX security camera footage also showed defendant passing through airport security without incident.

The airline employee who sold defendant a one-way $10,000 business class ticket to Hong Kong testified that defendant paid cash and he appeared "put together," if "a little nervous."  During their hour-long interaction, defendant did not appear to be suffering from a delusion, hallucination, or paranoia.  When the employee asked about cuts on his face, defendant said he cut himself in the bathroom.  Thinking something "was off," the employee sought approval from her supervisor and her manager to make the ticket sale.  Her supervisor spoke to defendant, determined that he was safe to fly, and persuaded

defendant to check his carry-on bag. When the supervisor asked about the cuts on his face, defendant said that he fell. The flight control officer also interviewed defendant. When asked about his facial scratches, defendant told the flight control officer that he cut himself shaving. During all of his interactions with the airline personnel during ticketing and check-in, defendant acted normally and answered questions and directions logically and coherently.

Defendant then took a nonstop flight to Hong Kong. If he had travelled from Hong Kong to mainland China, he would not have been subject to extradition to the United States. However, Hong Kong police detained defendant upon arrival, having been alerted by Los Angeles detectives. Hong Kong police seized defendant's personal belongings, which included a computer, multiple forms of identification, currency for multiple countries, credit cards, two cell phones, and $13,148 in United States currency. The cellphone associated with defendant's number contained an Internet search history that included queries from a week before the murders about committing a crime in the United States and fleeing to China to avoid punishment. One of the searches was: " 'Can a Chinese citizen who returns to China after committing a crime overseas with the victim being a local citizen avoid punishment.' "

Police also discovered that hours before defendant attacked Amy on January 21, 2016, he went to the local branch of EastWest Bank and wired $392,000 to an account in China from his joint account with Amy. Defendant spent over an hour filling

out nine separate transfers forms in the amount of $49,000 to avoid China's $50,000 limit.[3]

## II.  Defense Evidence During the Guilt Phase

The defense presented evidence of defendant's history of mental health issues and expert testimony about his compromised ability to reason due to mental illness.

Pan, a resident of China and defendant's longtime business associate, testified he worked closely with defendant for many years.  Defendant sometimes unexpectedly lost his temper.  On one occasion, defendant threw a box at and started a physical fight with a customer.  In 2013, the Chinese Communist Party took defendant away from his office and held him in custody for a month-long investigation.  When released, defendant was withdrawn and appeared paranoid that the phones were tapped.  The Chinese Communist Party took defendant into custody again the following year.  Upon his release, defendant secretly arranged to flee to the United States, where he started a new business.

At defendant's insistence, Pan travelled to Los Angeles on January 18, 2016.  Defendant, who was in poor spirits, asked Pan to talk to Amy to help save their marriage.  Pan stayed at a hotel with defendant in the days leading up to the murders.  Pan testified that defendant talked continuously either on the phone to friends and family or to Pan, and that defendant believed David was secretly monitoring him and turning Amy against him.  During their three days together, Pan did not see defendant sleep or eat more than one meal.

Pan accompanied defendant to the January 21, 2016 (the day of the attack on Amy) court hearing but stayed outside the

---

[3]     One of the transfers was not completed because the form was missing information.

courthouse. Although defendant appeared to be in good spirits before the hearing, he was very downcast and quiet when he returned to the car. While driving Pan away from the courthouse, defendant ran a red light. When Pan told him to stop, defendant replied that someone had instructed him to go. They then drove to a rental car company to arrange transportation to attend a business-related trade show. Defendant told Pan that the people there had strange looks in their eyes.

Defendant's niece, Jane, who lived in Australia, testified about their family's history of serious mental illness. Her mother (defendant's half-sister) suffered from extreme mood swings and episodes of violent conduct, including threats to kill Jane's father and to commit suicide. Jane's uncle, defendant's half sibling, likewise suffered from mental illness since childhood and had been repeatedly hospitalized and institutionalized after committing acts of violence against his mother. That uncle's son (defendant's nephew and Jane's cousin) was also institutionalized for endangering family members. Jane's grandmother suffered from mental illness, including chronic hallucinations. Jane further testified that in late 2015 or early 2016, defendant unexpectedly and repeatedly contacted Jane to talk about difficulties with his marriage to Amy and his overriding desire to reconcile with her.

Forensic psychologist Richard Romanoff opined as to defendant's ability to form the requisite mental state for murder. Romanoff conducted 195 hours of interviews over three years with defendant, and interviewed Pan, Jane, and defendant's sister. He also reviewed the police reports for the underlying crimes, interviews of Amy, David, Vicki, and Torres, defendant's

medical records from China, and considered defendant's family history of serious mental health illnesses. Based on his interviews and review, Romanoff diagnosed defendant with schizoaffective disorder and posttraumatic stress disorder. Symptoms of schizoaffective disorder include: (1) hallucinations—perceiving things, such as hearing voices, that aren't actually present in the external world—and (2) delusions—holding irrational or highly unusual beliefs that are not based in reality. The intensity of these symptoms is very individual and can fluctuate over time.

Defendant's medical records from China showed that he was hospitalized twice for psychiatric treatment. As a 15-year-old and again in his mid-20's, he was diagnosed with schizophrenia based on hallucinations, delusions, and manic episodes, along with acts of violence, emotional outbursts, and self-destructive acts, including suicide attempts. He was treated with anti-psychotic medications and electroconvulsive therapy. Defendant was first committed for treatment when he became paranoid and delusional after an adolescent love interest spurned him. His bouts of self-loathing included hearing voices that told him he was useless and would go to hell. After defendant cut himself in a suicide attempt at age 15, he was hospitalized for a month.

Dr. Romanoff testified that defendant's posttraumatic stress disorder resulted from his two detentions by the Chinese Disciplinary Committee, which exacerbated his schizoaffective disorder. During those detentions, defendant reported being interrogated and tortured with loud noises. Dr. Romanoff found that in the weeks leading up to the assault and murders, defendant suffered increasingly from insomnia and delusions

11

that his children were in danger of being kidnapped, that David's family was trying to take his money, and that David was using equipment to monitor him. His behavior was self-destructive and indicative of "an active psychotic illness." As a result, Dr. Romanoff opined that defendant's ability to deliberate and make rational choices was "significantly impaired."

Dr. Romanoff also testified defendant's decision to flee to China was not rational. He explained, "I would say it strains my understanding to think that a person with posttraumatic stress disorder who had been tortured twice and fled and left behind an awful lot of resources and assets there, would go back to a place where his sister had been begging him not to return to, and then he still goes back where he's certain to be arrested. There's a warrant for his arrest at this point. And so he's going back to a place where arrest is a certain thing for him having violated the terms of his essentially parole monitoring in China."

## III. The Prosecution's Rebuttal Evidence During the Guilt Phase

In rebuttal, the People presented testimony from forensic psychologist Carl Edward Osborn. Based on 5 two-hour interviews with defendant, interviews with Amy and Torres, and a review of thousands of pages of medical and criminal records, Dr. Osborn concluded that defendant was not psychotic and did not suffer from any psychiatric disorder. Rather, defendant had a "severe personality disorder" with "very strong borderline and narcissistic features." Referencing testimony from Amy and Torres,[4] Dr. Osborn found no reliable basis to believe that

---

[4] At trial, Amy testified that during their marriage from 1999 to 2016, defendant never had psychological or psychiatric treatments, did not take medications to treat psychological or

12

defendant experienced hallucinations or delusions to support diagnoses of schizoaffective disorder or posttraumatic stress disorder. He explained that the evidence of defendant's normal conduct at LAX after the killings was inconsistent with psychosis.

Dr. Osborn found that defendant was untruthful when he described symptoms of psychosis, explaining that the story defendant told people became increasingly exculpatory over time. He testified that defendant's "explosive temper" did "not include any psychotic process at all" and there was no basis for concluding that it emanated from hallucinations or delusions. Dr. Osborn was also skeptical about the reliability of the Chinese medical records because they lacked the extensive documentation typical of such reports in the United States. In short, Dr. Osborn found no basis to conclude that defendant was psychotic at the time of the crimes.

## IV. Insanity Phase

The jury found defendant guilty of first degree murder of his nephews and of injuring a spouse. The court thus turned to the insanity phase of the trial, where the defense relied entirely on Dr. Romanoff's testimony.

Dr. Romanoff provided his opinion based on the same materials he reviewed for the guilt phase, augmented by additional mental health evaluations and records from the state prison hospital. He stressed his reliance on 195 hours of personal interviews with defendant over the past two years. Dr. Romanoff

---

psychiatric issues, never appeared to be suffering from delusions or hallucinations, never attempted suicide, and did not have extreme mood swings. Torres testified that in all his years living with his father, he had never seen him suffering from hallucinations or delusions.

13

testified that defendant *was* capable of knowing or understanding the nature and quality of his acts. Therefore, solely at issue was whether defendant could not distinguish between right and wrong for the purposes of an insanity finding.

However, Dr. Romanoff testified that he was not able to form "a definitive conclusion in [his] own mind" as to whether defendant was legally insane at the time of the murders. The primary reason for his ambivalence was that defendant professed an "absence of memory for the events from before the offense committed against his wife, through the entire period of the sequence of events that occurred with . . . the murders of his nephews, and then continuing on through the period of time until he got to Hong Kong." Defendant had told Dr. Romanoff nothing about what he was thinking at the relevant times.

Although the expert could not reach an opinion on defendant's sanity when he committed the crimes, he noted that defendant's 1986 hospital records from China reported "command auditory hallucinations," in which defendant said he heard voices over a six-month period telling him, " 'you're useless, go to hell.' " Also, while at Patton State Hospital after his arrest, he was diagnosed with "posttraumatic stress disorder and a psychotic disorder of some sort."

Dr. Romanoff believed defendant's behaviors in the weeks and days leading up to the crimes showed that defendant was in an "increasingly paranoid and delusional state, an increasingly psychotic state" that was exacerbated by his posttraumatic stress disorder, which further militated against his "abilities to regulate himself." Crediting Pan's guilt-phase testimony, it appeared that defendant suffered from delusions, heard voices, and acted in an irrational, self-destructive manner (such as choosing to return to

14

China where he had been tortured) indicative of "disordered thinking."

On cross-examination, Dr. Romanoff agreed that defendant's prior diagnoses or self-reported instances of psychotic breaks alone did not support a determination that he was psychotic at the relevant time for establishing legal insanity when he committed the crimes.

He testified: "I see evidence that supports the finding, and I see evidence that is insufficient to support the finding or that raises questions about the finding. And in that state, I can't objectively find, I can't arrive at a conclusion to my satisfaction that supports insanity." On re-direct examination, Dr. Romanoff explained that the legal standard for offering an opinion as to insanity is whether there is a "reasonable medical certainty" for the determination. Applying that standard, he could not opine on whether defendant was insane when he committed the underlying crimes.

## V. Directed Sanity Verdict

At the conclusion of the defense case, the People moved for a directed verdict of sanity, arguing that defendant failed to present evidence he was insane at the time he committed the crimes. The defense responded that circumstantial evidence showed defendant did not know right from wrong when he committed the murders.

The trial court granted the motion, stating that it was viewing the defense evidence in the light most favorable to defendant and drawing all reasonable inferences in defendant's favor. The court concluded that at most, the defense expert "testified [that] in the days or hours before the attack, his level of psychosis could lead somebody to not know[] the difference

15

between right and wrong." However, there was no evidence supporting that this was the case when the crimes were committed. The court explained that defense expert Dr. Romanoff "conceded that defendant understood the nature and quality of his acts, but he did not give any opinion as to whether . . . defendant could distinguish between right and wrong." Dr. Romanoff was unable to form an opinion on the critical part of California's sanity test—whether defendant "deemed his conduct was morally right."

The court subsequently sentenced defendant to two consecutive terms of life without the possibility of parole for the murders, along with an additional eight-year term for the spousal injury. Defendant appealed.

## DISCUSSION

Defendant argues the trial court's directed verdict on his insanity defense violated his right to a jury trial under the Sixth Amendment and Due Process Clause. He also contends that he presented sufficient evidence in support of his not guilty by reason of insanity pleas to submit the issue to the jury. As we explain below, the directed verdict did not violate defendant's constitutional rights, nor did the court err in removing the issue of defendant's sanity from the jury.

## I. The Trial Court May Direct a Sanity Verdict Without Violating the Sixth Amendment or Due Process

Defendant contends his constitutional right to a jury trial under the Sixth Amendment and the Due Process Clause precluded the trial court from granting a directed verdict of sanity. "We review the legal question of whether defendant's

16

constitutional rights were violated de novo." (*People v. Palmer* (2020) 49 Cal.App.5th 268, 280.)

### a.    *Insanity Affirmative Defense*

"Insanity is a plea raising an *affirmative defense* to a criminal charge, although one that does not negative an element of the offense.  The plea of not guilty by reason of insanity is one of the six kinds of pleas to an indictment or information.  (Pen. Code, § 1016.)" (*People v. Hernandez* (2000) 22 Cal.4th 512, 522 (*Hernandez*).)  "A plea of not guilty by reason of insanity 'is a statutory defense that does not implicate guilt or innocence but, instead, determines "whether the accused shall be *punished* for the *guilt* which has already been established."  [Citations.]' ([*Hernandez, supra*,] 22 Cal.4th 512, 528 [conc. opn. of Brown, J.].)" (*People v. Blakely* (2014) 230 Cal.App.4th 771, 775 (*Blakely*).)  There is a two-prong test for insanity.  The defendant must show "that, based on a mental disease or defect, he was incapable of:  (1) knowing or understanding the nature and quality of his acts; or (2) distinguishing right from wrong when" he committed the crimes.  (*People v. Severance* (2006) 138 Cal.App.4th 305, 322 (*Severance*); *Blakely*, at p. 780 [" 'If [a] mental illness is manifested in delusions which render the individual incapable either of knowing the nature and character of his act, or of understanding that it is wrong, he [or she] is legally insane' " under California law.].)

"California as a matter of procedure has provided that the issue of guilt and sanity shall be tried separately.  (Pen. Code, § 1026.)  The . . . second facet of defendant's . . . trial differs from the first procedurally in that the issue is confined to sanity and the burden is upon the defendant to prove by a preponderance of the evidence that he was insane at the time of the offense."

17

(*People v. Flores* (1976) 55 Cal.App.3d 118, 121.) Like the guilt phase, "the question whether the defendant was sane or insane at the time the offense was committed [is] tried, either before the same jury or before a new jury in the discretion of the court." (§ 1026, subd. (a).)

The Courts of Appeal have held in multiple instances that, "[b]ecause a plea of insanity is an affirmative defense in which the defendant has the burden of proof, the court may, through the grant of a directed verdict, 'remove the issue of sanity from the jury when the defendant has failed to present evidence sufficient to support the special plea.' (*People v. Ceja* (2003) 106 Cal.App.4th 1071, 1089 [(*Ceja*)]; see *Severance*, *supra*, 138 Cal.App.4th at p. 324 [noting the court properly directed a verdict of sanity because even if credited and viewed in the light most favorable to the defendant, he failed to proffer sufficient evidence of legal insanity, including evidence providing a substantial basis for the jury to find that when he committed the crimes he believed his actions were morally acceptable].)" (*Blakely*, *supra*, 230 Cal.App.4th at p. 775.)

**b.     *Defendant's Right to Trial by Jury for His Insanity Plea***

Defendant contends that by directing a verdict on the issue of insanity, the trial court violated his right to trial by jury.

"The Sixth Amendment, made applicable to the states in this context by the Fourteenth Amendment of the federal Constitution, confers upon a defendant in a criminal prosecution the right to a trial by jury. [Citations.] The right to a trial by jury is recognized to be a 'fundamental constitutional right.' [Citations.] Similarly, article I, section 16, of the California Constitution confers upon a defendant in a criminal prosecution

18

the right to a trial by jury." (*People v. Collins* (2001) 26 Cal.4th 297, 304.) In *Apprendi v. New Jersey* (2000) 530 U.S. 466, 494 (*Apprendi*), the United States Supreme Court held that any fact that "expose[s] the defendant to a greater punishment than that authorized by the jury's guilty verdict" is an "element" that must be submitted to a jury.

In *Ceja, supra*, 106 Cal.App.4th at page 1079, the defendant contended "[b]ased on the United States Constitution, the Sixth and Fourteenth Amendment, and the California Constitution, article I, section 16, . . . it is error in a criminal action for a trial court to direct a [sanity] verdict in favor of the prosecution." In rejecting the defendant's argument, Division Four of this District held that trial courts have the inherent power to direct a verdict on an insanity defense when there is no evidence to support insanity and that "there is no constitutional infirmity, either under the California Constitution or the United States Constitution, for a judge to remove the issue of sanity from the jury." (*Id.* at p. 1089.)

The *Ceja* court, relying in part on Justice Brown's concurrence in *Hernandez*, observed that " '[u]nder the United States and California Constitutions, a criminal defendant has the right to a jury determination of all elements of the charged offenses. [Citations.] Because a finding of insanity under California law "is dispositive only on the question of whether the accused is to be held criminally responsible for committing the charged offense[,] it is not determinative of whether the elements of the offense, and thus the criminal conduct itself, have been established." [Citations.] Thus, taking the issue of insanity away from the jury does not violate the United States or California Constitution. [Citations.]' (*People v. Hernandez, supra*, 22

19

Cal.4th at pp. 528–529, fn. omitted.)" (*Ceja, supra,* 106 Cal.App.4th at p. 1084.) The *Ceja* court concluded: "there is no constitutional infirmity, either under the California Constitution or the United States Constitution, for a judge to remove the issue of sanity from the jury when the defendant has failed to present evidence sufficient to support the special plea. As recognized by Justice Brown in *Hernandez*, and the prior cases involving double jeopardy, courts retain an inherent power to remove an affirmative defense from the jury where there is no evidence to support it." (*Id.* at p. 1089.)

In *Severance, supra,* 138 Cal.App.4th at page 315, the Third District Court of Appeal addressed a defendant's contention that " '*Ceja* is wrong because dismissal of a plea of not guilty by reason of insanity offends constitutional principles of due process and the right to present [an] affirmative defense to a jury, and also because the Legislature has, by statute, created the right to a jury trial on a plea of not guilty b[y] reason of insanity without giving the trial court any statutory authority to take the issue from the jury.' " The *Severance* court disagreed: " 'Where "the evidence is uncontradicted or leads to a single conclusion a question of law is presented" [citation], and "the trial court is not required to submit the question to the jury for a finding upon that plea" [citation]. Instead, the court may strike the plea [citation], or direct a verdict in favor of the prosecution or the defendant.' (See, e.g., *People v. Bechtel* (1953) 41 Cal.2d 441, 445; *People v. Wilson* (1924) 193 Cal. 512, 514–515; *People v. Newell* [(1923) 192 Cal. 659,] 668.) There is no logical reason these same principles should not apply to a plea of insanity. Just as a criminal defendant may be 'precluded from presenting to a jury defense such as unconsciousness [citation], diminished capacity

20

[citation], [or] entrapment [citation], where there is insufficient evidence from which a reasonable jury could conclude that the particular facts underlying the instruction requested exist' (*People v. Mapp* (1983) 150 Cal.App.3d 346, 350), so a criminal defendant may be precluded, through the grant of a directed verdict, from presenting an insanity defense where the evidence is insufficient for a reasonable jury to find the defendant was insane at the time of his crimes." (*Id.* at pp. 316–317.)

### c. *We Agree with* Ceja *and* Severance

Defendant urges us to disregard *Ceja* and *Severance* because they adopt analysis from Justice Brown's concurring opinion in *Hernandez, supra*, 22 Cal.4th at page 528, which likened the affirmative defense of insanity to the affirmative defense of double jeopardy when concluding the trial court could direct a verdict on sanity without violating the defendant's right to trial by jury. (See *Ceja, supra*, 106 Cal.App.4th at pp. 1083–1085, citing *Hernandez, supra*, 22 Cal.4th at pp. 528–529 (conc. opn. of Brown, J.).) Defendant argues "[u]nlike a plea of once in jeopardy, a defendant's plea that he committed the offense while insane *does* go to his culpability," and thus insanity should be treated differently. Defendant argues that *Severance* tracked *Ceja*'s reasoning.

We are unpersuaded by defendant's argument. As *Severance* points out in responding to a similar argument, both insanity and double jeopardy defenses present issues of fact which the jury alone possesses the power to pass on. (*Severance, supra*, 138 Cal.App.4th at p. 316.) "Like any issue that is usually treated as one of fact, the issue of a defendant's sanity can become one of law in the proper circumstances. 'An issue of fact is one where the evidence introduced will support a decision on

21

either side, that is to say, reasonable minds could fairly differ as to the answer to the question posed. [Citations.] An issue of fact can become an issue of law when reasonable minds can draw only one conclusion from the evidence. [Citations.] An issue of fact cannot be taken from a jury by the trial court and treated as an issue of law unless only one conclusion is legally deducible and any other conclusion cannot command the support of substantial evidence that will survive appellate review." (*Ibid.*) Defendant does not make a compelling argument why a defendant, who fails to present evidence of insanity, nonetheless has a right to have a jury decide this factual issue.

We agree with the analysis set forth in *Ceja* and *Severance*. Furthermore, their analysis is consistent with *Apprendi, supra,* 530 U.S. at page 494, which held that any fact that "expose[s] the defendant to a greater punishment than that authorized by the jury's guilty verdict" is an "element" that must be submitted to a jury. As the affirmative defense of insanity is not an element the prosecution must prove, we see no error under *Apprendi* either.

We thus conclude that where a defendant fails to present evidence to support his insanity defense, the trial court may direct a verdict on sanity without violating the defendant's constitutional rights.

## II. Defendant Failed to Present Substantial Evidence of Insanity

We next turn to whether the trial court erred in this instance by directing a verdict on insanity based on the evidence before it.

### a. *Applicable Law*

A trial court may direct a verdict on sanity " ' "only when, disregarding conflicting evidence and giving to [the opposing

22

party]'s evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given." [Citations.]  Unless it can be said as a matter of law, that, when so considered, no other reasonable conclusion is legally deducible from the evidence, and that any other holding would be so lacking in evidentiary support that a reviewing court would be impelled to reverse it upon appeal, or the trial court to set it aside as a matter of law, the trial court is not justified in taking the case from the jury.  [Citation.]  A motion for a directed verdict "is in the nature of a demurrer to the evidence, and is governed by practically the same rules, and concedes as true the evidence on behalf of the adverse party, with all fair and reasonable inferences to be deduced therefrom. . . .  The power of a court in passing upon such motions is strictly limited.  It has no power to weigh the evidence, but is bound to view it in the most favorable light in support of the verdict. . . ." [Citation.]  In other words, the function of the trial court on a motion for a directed verdict is analogous to and practically the same as that of a reviewing court in determining, on appeal, whether there is evidence in the record of sufficient substance to support a verdict.  Although the trial court may weigh the evidence and judge . . . the credibility of the witnesses on a motion for a new trial, it may not do so on a motion for a directed verdict.' " (*Blakely*, *supra*, 230 Cal.App.4th at pp. 775–776.)

Although we apply the substantial evidence standard of review, in doing so " 'we do not look for substantial evidence in support of the trial court's ruling that defendant was sane;

rather, we look for substantial evidence from which the jury reasonably could have found defendant was *not* sane.  If we find such evidence, then a directed verdict of sanity was improper.' (*Severance, supra,* 138 Cal.App.4th at p. 320.)" (*Blakely, supra,* 230 Cal.App.4th at p. 776.)  Specifically, we are looking for substantial evidence that due to a mental disease or defect, defendant "was incapable of (1) knowing or understanding the nature and quality of his acts or (2) distinguishing right from wrong when he [committed the murder].  (See *Severance, supra,* 138 Cal.App.4th at p. 322.)" (*Ibid.*)

In *Severance, supra,* 138 Cal.App.4th 305, at pages 309 and 318, the Court of Appeal upheld a directed verdict of sanity, finding no substantial evidence that the defendant was legally insane when he committed a series of robberies.  During the sanity phase, the defendant testified that he committed the robberies because "when he is hit on the head he becomes paranoid and schizophrenic, Satan takes control of his mind and body, and he does things he does not normally do." (*Id.* at p. 322.) The defendant also stated that he took psychotropic medications prescribed for people who hear voices.  (*Ibid.*)  The defendant contended this testimony supported a finding of insanity, arguing the jury could have found he suffered from a delusion that his conduct was morally justified.  (*Id.* at p. 323.)  The appellate court disagreed, holding the evidence was insufficient because "there was no evidence about what [the] defendant believed or did not believe" concerning the moral rightness or wrongness of his actions at the time of the offenses.  (*Id.* at p. 324.)

Similarly, in *Blakely, supra,* 230 Cal.App.4th at pages 773 and 779, the Court of Appeal upheld the trial court's decision to remove the issue of Blakely's sanity from the jury in his trial for

24

assault with a deadly weapon and robbery. At the sanity phase, a psychologist who had examined Blakely testified that he "suffered from 'paranoid schizophrenia or schizoaffective disorder, paranoid type,' but was unable to form an opinion about Blakely's sanity in April 2010 when he committed the crimes." (*Id.* at p. 776.) Blakely had told the psychologist that he heard voices telling him to hurt people and that he had visual hallucinations. (*Ibid.*) "Blakely had a difficult time recalling events during the interview. [The psychologist] testified that memory loss could be a symptom of a person who is actively hallucinating. [The psychologist] also considered the possibility that Blakely's sporadic memory could have been caused by an injury he suffered from a bullet wound to the frontal area of his forehead." (*Id.* at p. 777.) When counsel indicated Blakey had been rocking back and forth after attacking the victim, the psychologist opined the rocking was common behavior for a schizophrenic episode. (*Ibid.*) However, when the psychologist asked Blakely about the assault and robbery, Blakely responded that he did not remember. (*Ibid.*) With inadequate information about Blakely's state of mind, the psychologist could not render an opinion about whether he was insane when he committed the crimes. (*Ibid.*)

In addition, "Blakely testified that he suffered from schizophrenia most of his life and was taking psychotropic medications at the time of the crimes. He claimed that when he stepped outside the supermarket he heard voices say, '[t]here he is right there,' referring to [the victim]. Blakely believed the voices meant [the victim] was 'the demon.' Based on this evidence, Blakely contends 'the jurors could have found that because of his delusional state, [he] had a moral imperative to rid

25

the world of [the victim], who was the devil.' Thus, Blakely's claim is that he suffered an insane delusion which rendered him incapable of distinguishing right from wrong." (*Blakely*, *supra*, 230 Cal.App.4th at p. 780.)

The Court of Appeal disagreed, stating: "there is no evidence in the record before us from which a jury could reasonably conclude that Blakely believed his crimes were morally justified. Although Blakely testified he suffered from a delusion that [the victim] was a demon, at no point during his testimony did Blakely state that he believed it was morally acceptable to attack [the victim] and take his money. Without such evidence, Blakely cannot establish by the preponderance of the evidence the defense of insanity." (*Blakely*, *supra*, 230 Cal.App.4th at p. 781.) Likening the case to *Severance*, the *Blakely* court concluded: "While we acknowledge Blakely presented evidence that he suffered from paranoid schizophrenia, he did not present sufficient evidence for the jury to reasonably conclude he was incapable of distinguishing the moral rightness or wrongness of his actions when he attacked and robbed [the victim]." (*Id.* at p. 779.)

### b.  *No Evidence Defendant Was Unable to Distinguish Moral Right from Wrong at the Time of the Offenses*

Here, the defense expert eliminated the first prong of the sanity test when he testified that defendant understood the nature and quality of his acts. Thus, the court was tasked with determining whether there was substantial evidence presented that defendant could not distinguish right from wrong when he committed the crimes due to a mental disease or defect. We conclude the court did not err in finding that defendant failed to

26

meet this burden. Like in *Blakely*, the expert here could not opine about defendant's sanity at the time the crimes were committed and no other circumstantial evidence provided substantial evidence of insanity.

Although defendant presented evidence that he had schizoaffective disorder and posttraumatic stress disorder, he did not present any evidence that he could not understand right from wrong when he bludgeoned Amy and murdered his nephews. Defense expert Dr. Romanoff testified that he was unable to "arrive at a definite conclusion" as to whether defendant was legally insane at the time of the murders. This was largely because defendant told him he could not remember "the events from before the offense committed against his wife, through the entire period of the sequence of events that occurred with . . . the murders of his nephews, and then continuing on through the period of time until he got to Hong Kong."

Dr. Romanoff testified that in 1986, when defendant was a teenager, defendant had an episode of losing control and had experienced episodes of losing control in the two months leading up to the murders, with the "extent of the out-of-control-ness" seeming to increase. Drawing on testimony from Pan and Jane, as well as his own interviews with defendant and defendant's sister, Dr. Romanoff concluded that defendant was experiencing active psychosis triggered by his schizoaffective disorder and PTSD in that two-month period. The expert stated this deterioration in mental state was illustrated by defendant's out-of-control behavior, including incidents of domestic violence such as hitting and assaulting Amy. Dr. Romanoff credited testimony describing symptoms such as auditory hallucinations, paranoid delusions about David monitoring him with "strange equipment,"

uncontrollable crying, and angry outbursts. He characterized defendant's behavior as self-destructive and testified: "So it's becoming increasingly irrational from my perspective as time is unfolding. And he's losing the ability to control himself. He can't get no insight [*sic*] into this at this point. He's not understanding that this is happening."

However, during cross-examination, Dr. Romanoff admitted that just because defendant had hallucinations or delusions at earlier points in time does not mean that at the time of the crimes, defendant was insane. Dr. Romanoff acknowledged that having "some kind of statement or piece of evidence right at the time of a murder that would indicate [that] the person was either experiencing auditory hallucinations or delusion[s] or something that . . . indicated they didn't know right from wrong" would make the task of evaluating defendant's sanity much easier. Because defendant offered no such evidence and made no statements about his mindset during the crimes, Dr. Romanoff could not assess whether defendant understood his actions were wrong.

Defendant argues that although Dr. Romanoff testified that he could not opine on defendant's insanity to a " *'reasonable medical certainty*,' " the jury could nonetheless find that defendant was insane by *"a preponderance of the evidence*—the applicable legal, as opposed to medical, standard." Yet, the evidence failed to establish insanity by any standard. As mentioned, Dr. Romanoff provided no opinion as to defendant's mental state during the relevant time period. Testimony from Pan and Jane did not address defendant's mental state, statements, or behavior during the pertinent time frame— immediately before or during the crimes.

The only evidence of defendant's mindset with regard to his criminal conduct showed planning and awareness of what he was doing. A week before the murders, he searched the Internet for information about committing a crime in the United States and fleeing to China to avoid punishment, including whether a Chinese citizen could escape liability for killing a local citizen abroad. Hours before assaulting Amy, he withdrew $392,000 from their joint account and transferred funds to a Chinese bank. A bank employee who interacted with him for over an hour observed no signs of delusions or hallucinations. Defendant also removed license plates from his car and, after bludgeoning Amy, told his son, Torres, that he needed to flee because the police were coming. Both Torres and Amy testified that defendant did not appear to be experiencing delusions or hallucinations when he attacked Amy or at any time in the past.

After murdering his nephews, defendant drove to LAX, bought a one-way ticket to China, and behaved normally with airline staff. LAX security footage similarly showed no signs of active psychosis. Thus, the only circumstantial evidence of defendant's mindset during the relevant timeframe showed that defendant planned the crimes and anticipated the need to escape, indicating that defendant understood his actions were wrong. The record contains no evidence to the contrary.

Defendant argues that his memory loss and "harebrained" escape plan indicate mental illness and insanity. Defendant contends that this irrational behavior, combined with his mental deterioration and increasingly psychotic state in the period of time leading up to the crimes could support a finding of legal insanity under California law.

29

We disagree. First, there was no testimony whatsoever that defendant's lack of memory evidenced his mental illness and insanity. Defendant offers no citation to the record to support this claim or identifies any witness who so testified. Even if his escape plan was "harebrained," it does not show defendant lacked moral understanding—it merely suggests desperation or self-destruction. Assuming defendant was psychotic, psychosis alone does not establish legal insanity. As Dr. Romanoff explained, a person's ability to distinguish the hallucination or fantasy from reality "varies infinitely from person to person and for each individual over time." A person with hallucinations or delusions may still understand right from wrong depending on how the condition affects their cognition.

Here, no expert testified and no circumstantial evidence at the relevant time showed that defendant's psychosis rendered him incapable of distinguishing right from wrong when committing the crimes. The only relevant evidence of his mental state showed "intentional" and "goal-directed" conduct, as described by Dr. Romanoff. Like in *Blakely* and *Severance*, defendant failed to present substantial evidence that he was legally insane at the time of the murders.

30

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

EGERTON, J.

ADAMS, J.